**BRISTOL–MYERS SQUIBB COMPANY, Plaintiff–Appellee, Cross–Appellant,**

v.

**McNEIL–P.P.C., INC., Defendant–Appellant, Cross–Appellee.**

**Nos. 1387, 1492, Docket 92–7212, 92–7260.**

United States Court of Appeals, Second Circuit.

Argued April 30, 1992.

Decided Aug. 21, 1992.

deferential reading"); *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990) (same).

Mulligan, Patterson, Belknap, Webb & Tyler, of counsel), for appellant.

Lawrence I. Weinstein, New York City (Alfred T. Lee, Samuel D. Rosen, Brendan J. O'Rourke, Milgrim Thomajan & Lee, of counsel), for appellee.

Before: MESKILL, Chief Judge, NEWMAN, Circuit Judge, and ZAMPANO,* District Judge.

MESKILL, Chief Judge:

This is an appeal from a preliminary injunction entered in the United States District Court for the Eastern District of New York, Spatt, J., in an action brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and various state unfair competition laws. The preliminary injunction prevents the appellant, McNeil–P.P.C., Inc. (McNeil) from marketing its product, "Tylenol PM," in the trade dress that it had been using prior to the injunction. Also before us is a cross-appeal by Bristol–Myers Squibb Company (Bristol) from the denial of preliminary injunctive relief preventing McNeil from using the term "PM" in connection with a combination analgesic/sleep aid.

As in any case under section 43(a) of the Lanham Act, the ultimate question here is whether, because of the challenged markings, consumers are likely to be confused as to the origin or sponsorship of goods. Because we believe that the district court erred in finding that the "Tylenol PM" trade dress was likely to cause confusion among purchasers due to its similarity to Bristol's "Excedrin PM" trade dress, we reverse the preliminary injunction. Because we agree with the district court's denial of Bristol's request preliminarily to enjoin McNeil's use of the term "PM," we affirm as to the cross-appeal.

Affirmed in part and reversed in part.

## BACKGROUND

Bristol is a major pharmaceutical company that produces and markets "Excedrin,"

Gregory L. Diskant, New York City (Stephen P. Younger, Lisa C. Cohen, Mary E.

---

* Honorable Robert C. Zampano, United States District Judge for the District of Connecticut, sitting by designation.

a nationally known over-the-counter analgesic pain reliever. Since 1968 Bristol has manufactured and distributed "Excedrin PM," a product that combines an analgesic with a sleep aid.

Although there have been some alterations over the years, the packaging of "Excedrin PM" has remained fairly constant. That packaging consists of an outer carton with a solid deep blue background, white lettering for the name "Excedrin PM," which appears on a single line, with "Excedrin" in lower case lettering except for the initial "E" and "PM," which are in capital letters. In the lower right portion of the face of the box is a depiction of two light blue tablets, each marked "PM." In 1988, Bristol introduced a caplet form of "Excedrin PM." The trade dress for this caplet form is similar to that of the tablet form except that the background is a solid dark green and there is a depiction of two caplets each displaying the full name "Excedrin PM." On both packages the word "Excedrin" occupies approximately one-third of the total face of the package.

McNeil is also a major pharmaceutical company. Among McNeil's products is "Tylenol," which, like "Excedrin," is a nationally famous over-the-counter analgesic. In 1991 McNeil introduced "Tylenol PM," which, like "Excedrin PM," is a combination analgesic/sleep aid. Although there are slight differences in the composition of the two products, it is undisputed that those differences are not material and that the two products are functionally interchangeable. Like "Excedrin PM," "Tylenol PM" comes in two forms: tablet and caplet.

The packaging for the tablet form of "Tylenol PM" consists of a box with a green background that shifts from dark green at the top of the box to light green at the bottom and the name "Tylenol" in white capital letters with "PM" in yellow capital letters on the same line. In addition, the package depicts two tablets on the lower right face of the package, one of which is imprinted with the word "Tylenol" and the other of which is marked "PM." The trade dress for the caplet form of "Tylenol PM" resembles that of the tablet form except that the background fades from dark to light blue rather than green and two caplets, each of which reads "Tylenol PM," are depicted instead of the tablets. On both forms of the "Tylenol PM" trade dress, the word "Tylenol" occupies approximately one-third of the total area of the face of the package.

Shortly after "Tylenol PM" was introduced, Bristol filed this action before Judge Spatt in the United States District Court for the Eastern District of New York, seeking relief under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and on various state law grounds. Bristol moved for a preliminary injunction to prevent McNeil from using the term "PM" in connection with a combination analgesic/sleep aid and to prevent McNeil from marketing an analgesic/sleep aid in the "Tylenol PM" packaging described above.

Judge Spatt referred the matter to Magistrate Judge Orenstein pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge heard evidence and examined exhibits and the results of discovery. The magistrate judge filed a report in the district court in which he made certain findings of fact and ultimately recommended that the preliminary injunction be denied. Both parties made timely objections to various portions of the magistrate judge's report and the district court addressed the matter de novo pursuant to 28 U.S.C. § 636(b)(1).

The district court denied Bristol's request for an injunction preventing McNeil from using the term "PM" in connection with an analgesic/sleep aid, finding that "PM" in this context did not qualify for protection under section 43(a) of the Lanham Act. The district court granted, however, Bristol's request for an injunction with regard to the "Tylenol PM" trade dress because it found that Bristol had demonstrated that the similarities between the two packages were likely to cause consumer confusion 786 F.Supp. 182. Both parties appealed and a panel of this Court stayed the preliminary injunction pending appeal.

## DISCUSSION

### I. PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, the moving party must demonstrate both (1) irreparable harm in the absence of the requested relief, and (2) either (a) a likelihood that it will succeed on the merits of the action, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party. *See Jackson Dairy v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). In the context of a Lanham Act claim both the likelihood of success on the merits and the potential for irreparable harm in the absence of preliminary relief may be demonstrated by a showing that a significant number of consumers are likely to be misled or confused as to the source of the products in question. *Western Publishing Co. v. Rose Art Industries,* 910 F.2d 57, 59 (2d Cir. 1990).

▇▇▇ We have jurisdiction to review the grant or denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1). We review a district court's decision whether to issue a preliminary injunction only for an abuse of discretion. *Doran v. Salem Inn,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975). "Applying legal standards incorrectly or relying upon clearly erroneous findings of fact may constitute an abuse of discretion." *Haitian Centers Council v. McNary,* 969 F.2d 1326, 1338 (2d Cir.1992) (citation omitted). We are not, however, limited to "reversing only when the lower court's action exceeds any reasonable bounds and to rubber-stamping with the imprimatur of an affirmance when it does not." *Coca–Cola Co. v. Tropicana Products,* 690 F.2d 312, 315 (2d Cir.1982) (citation omitted). Although our scope of review is limited, if we are left with " 'the definite and firm conviction that a mistake has been committed' " we will

reverse the grant or denial of a preliminary injunction. *See Standard & Poor's Corp. v. Commodity Exchange,* 683 F.2d 704, 708 (2d Cir.1982) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). With these principles in mind, we turn to the parties' specific claims.

### II. THE LANHAM ACT CLAIMS

Neither the "PM" designator nor the "Excedrin PM" trade dress is a registered trademark. Bristol, therefore, relies on that part of the Lanham Act that addresses unregistered marks. Section 43(a) of the Lanham Act prohibits any person from using

> in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person.

15 U.S.C. § 1125(a).[1] "[I]t is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992) (citations omitted). As the words of the statute indicate, the central inquiry is whether the use of a marking is likely to cause consumer confusion.

Bristol makes two related claims under section 43(a). First, Bristol claims that the use by McNeil of the term "PM" in connection with its combination analgesic/sleep aid is likely to cause confusion as to the source, sponsorship or approval of "Tylenol

---

**1.** This language was added in 1988 by P.L. 100–667, Title I, § 132, and replaced the original section 43(a) which had been enacted in 1946. The Senate Report accompanying the amendment indicates that the intent of the new language was "to codify the interpretation [section 43(a) ] has been given by the courts." Senate Report No. 100–515, *reprinted in* 1988 U.S.Code Cong. & Admin.News 5577, 5603; *see Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, n. 18, 112 S.Ct. 2753, 2765 n. 18, 120 L.Ed.2d 615 (1992) (Stevens, *J.,* concurring). Thus our precedents predating the new language remain in force.

PM." Second, Bristol claims that the overall look of the "Tylenol PM" packaging, its trade dress, is so similar to the trade dress of Bristol's "Excedrin PM" that consumers will confuse the two.

■ Before we will address whether an allegedly infringing mark is likely to cause consumer confusion, the plaintiff must show that its trademark or trade dress is of the type that deserves protection under section 43(a). *See Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir. 1985). The plaintiff then must demonstrate that the use by the defendant of a mark or dress is likely to cause consumer confusion because of the similarity between the defendant's mark or dress and the mark or dress of the plaintiff. *See id.*

A. *Trademark Infringement: The "PM" Designator*

To facilitate our analysis, we will deal first with the cross-appeal. Bristol appeals from the district court's refusal to grant preliminary injunctive relief preventing McNeil from using the term "PM" appended to its "Tylenol" trade name to designate its combination analgesic/sleep aid. Under the terms of the preliminary injunction, McNeil remains free to market "Tylenol PM" in a trade dress that does not resemble the "Excedrin PM" trade dress. The district court agreed with the magistrate judge that the term "PM" as used by Bristol did not warrant protection under section 43(a).

In making the preliminary inquiry into whether a particular mark is eligible for protection under section 43(a), we have established several categories into which we classify various marks. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World*, 537 F.2d 4, 9 (2d Cir.1976). Suggestive, arbitrary and fanciful marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are enti-

tled to protection." *Two Pesos*, — U.S. ——, 112 S.Ct. at 2757. Generic marks are never entitled to protection, while a descriptive mark is eligible for protection "if it 'has become distinctive of the [producer's] goods in commerce.' This acquired distinctiveness is generally called 'secondary meaning.'" *Id.* — U.S. at ——, 112 S.Ct. at 2757 (citations omitted).

■ Although we have not expressly articulated the standard of review appropriately applied to a district court's classification of a mark, other courts of appeals have found that classification to be a factual question, review of which is limited to whether the district court was clearly erroneous in its determination. *See, e.g., Ford Motor Co. v. Summit Motor Products*, 930 F.2d 277, 292 n. 18 (3d Cir.) ("The characterization of a mark is a factual issue.") (citations omitted), *cert. denied*, — U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *G. Heileman Brewing Co. v. Anheuser-Busch*, 873 F.2d 985, 992 (7th Cir.1989) ("[T]he district court's classification of a term on the trademark spectrum is a factual determination subject to the 'clearly erroneous' standard of review."); *Wiley v. American Greetings Corp.*, 762 F.2d 139, 141 (1st Cir.1985) ("Whether a design is 'inherently distinctive,' *i.e.*, whether it is arbitrary or merely descriptive, is ordinarily a question of fact.") (citation omitted); *Anheuser-Busch v. Stroh Brewery Co.*, 750 F.2d 631, 635 (8th Cir.1984) ("[T]he categorization of a term for which trademark protection is claimed is considered to be a factual issue and thus is to be reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52(a).") (citations omitted); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 n. 12 (5th Cir.1980) ("Any given term's correct categorization is a factual issue.") (citations omitted), *cert. denied*, 450 U.S. 981 (1981); *cf. In re Northland Aluminum Products*, 777 F.2d 1556, 1559 (Fed.Cir.1985) ("Whether a term is a common descriptive name is a question of fact" in context of trademark registration.) (citation omitted). We agree with these courts that the initial classification of a mark to determine its eligibility for protec-

tion is a question of fact left to the determination of the district court. We will substitute our own judgment on the matter for that of the district court only if the district court's determination is clearly erroneous. Fed.R.Civ.P. 52(a).

■ The district court classified the "PM" mark as descriptive. Bristol argues that the mark is suggestive. Neither party claims that the mark is generic, arbitrary or fanciful. The question in this case, therefore, is whether "PM," when affixed to an analgesic trade name, is descriptive or suggestive of the product, a combination analgesic/sleep aid.

■ A descriptive mark is one that " 'forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.' " *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted). "[A] term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." *20th Century Wear v. Sanmark–Stardust,* 747 F.2d 81, 88 (2d Cir.1981), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). A term is suggestive " 'if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.' " *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted).

■ Although the line between descriptive and suggestive may be difficult to discern, *see id.* at 10–11, the consequence of the classification is important. A descriptive term is subject to protection under section 43(a) only if the proponent of protection demonstrates that, in addition to the ordinary common meaning of the word or words, the term has acquired a secondary meaning in its particular market—that the consuming public primarily associates the term with a particular source. *See Centaur Communications, Ltd. v. A/S/M Communications,* 830 F.2d 1217, 1221 (2d Cir.1987); *Thompson Medical,* 753 F.2d at 212–13. The public presumably will not be confused by a descriptive term, but if the proponent of protection can show that the descriptive term is primarily associated with a single producer, a sufficient question is raised to justify further inquiry into the likelihood of confusion. In contrast, if its mark is suggestive a plaintiff need not prove such secondary meaning in order to qualify for trademark protection. *Id.* at 213.

In this case, the "PM" acts as a modifier to the analgesic brand name. Both "Tylenol" and "Excedrin" are well known brand names for analgesics; the "PM" modifies each to show that they are a particular type of analgesic. "PM," usually abbreviated "p.m." or "P.M." (for "post meridiem"), is a common term that refers to the period of time between noon and midnight. It is often associated with the time when most people go to sleep.

As used here, "PM" does not literally describe the presence of a sleep aid in the product. The "PM" refers to the purpose or utility of the product—it is an analgesic that should be used at night. The issue, therefore, is whether the connection between "PM" and a nighttime sleep aid is direct enough that the term may be categorized as descriptive or whether the connection is more indirect, requiring categorization as suggestive.

Bristol argues that "PM" is suggestive because a consumer must engage in a multi-step analysis before coming to the conclusion that it denotes the presence of a sleep aid in the analgesic. Bristol asserts that the consumer first must eliminate possible alternate meanings for "PM"—*e.g.,* "Pre–Menstrual" or "Pain Medication"—before arriving at "Post Meridiem." Next, Bristol argues, the consumer must make a leap from all the post meridiem hours to those at night, and a further intellectual leap from nighttime to sleeping.

The magistrate judge found that several other over-the-counter products are designated as nighttime products by the use of some close variant of "PM." The magistrate judge held in that context that "[t]he direct connotation of 'PM' is nighttime. There is *no* 'multi-stage reasoning process' that a consumer must indulge in to associate the term 'PM' with a nighttime product."

■ We cannot say that the district court's adoption of this finding was clearly erroneous. The focus in categorizing a mark is on how the words are used in context rather than their meaning in the abstract. *See Abercrombie & Fitch,* 537 F.2d at 12. One of the leading commentators has offered the following example to demonstrate the context-dependent nature of the classification: "[T]he word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." 1 J.T. McCarthy, Trademarks and Unfair Competition § 11:22, at 498–99 (2d ed. 1984). There was sufficient evidence before the magistrate judge to support the finding that several nighttime products were sold using some variant of "PM." Given that context, the conclusion that "PM" describes rather than suggests a nighttime product was not clearly erroneous. Once the consumer arrives at an awareness that the product is useful at nighttime, the "purpose or utility" of the product has been conveyed, even though the consumer is not aware of why the product is useful at night. *See Thompson Medical,* 753 F.2d at 216 & n. 15 ("Sportscreme" descriptive of cream useful in sports even though inadequately descriptive as to significance of product). Therefore, the consumer need not conclude that the analgesic contains a sleep aid.

Given the deferential standard of review, and the fact that this matter is before us at the preliminary injunction stage, we will not disturb the district court's finding that "PM" is descriptive.

■ Because "PM" is a descriptive term it is not entitled to trademark protection unless Bristol demonstrates secondary meaning. The district court found that Bristol had not established that the "PM" designator had acquired secondary meaning. We agree with the district court.

■ "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (citation omitted). Secondary meaning is an essentially factual determination, proof of which " 'entails vigorous evidentiary requirements.' " *Thompson Medical,* 753 F.2d at 217 (citation omitted); *see Coach Leatherware v. AnnTaylor, Inc.,* 933 F.2d 162, 169 (2d Cir.1991). We will reverse the district court's determination that a term has not acquired secondary meaning only if that determination is clearly erroneous. *See Murphy v. Provident Mut. Life Ins.,* 923 F.2d 923, 928 (2d Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991); *815 Tonawanda Street Corp. v. Fay's Drug Co.,* 842 F.2d 643, 647 (2d Cir.1988).

Among the factors that we have found relevant to this inquiry in the past are advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use. *Thompson Medical,* 753 F.2d at 217. There are undoubtedly other types of evidence that would also be relevant to a claim of secondary meaning. The fundamental question, however, is whether " 'the *primary* significance of the term in the minds of the consuming public is not the product but the producer.' " *Centaur Communications,* 830 F.2d at 1221 (citations omitted).

"The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation." *PaperCutter, Inc. v. Fay's Drug Co.,* 900 F.2d 558, 564 (2d Cir.1990) (citation omitted). The district court found that Bristol had not presented sufficient evidence that consumers recognized the source of "Excedrin PM" by the "PM" designator and that there was no evidence that Bristol had ever marketed the product as "PM."

■ Bristol suggests two grounds in support of its contention that the district court's finding that the "PM" mark had not acquired secondary meaning was clearly

erroneous. First, Bristol argues that McNeil's intentional copying of its mark is indicative of secondary meaning. Although imitative intent can help support a finding of secondary meaning, *see Centaur Communications*, 830 F.2d at 1224, it does not necessarily mandate one, *see American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979) ("[N]o single factor is determinative."), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Therefore, we believe that, even assuming McNeil's imitative intent, the district court was not bound to find that the "PM" designator had acquired secondary meaning.

Second, Bristol argues that the fact that each "Excedrin PM" tablet is imprinted with "PM" shows that the consuming public must associate "PM" with Bristol. However, "[a]lthough the mark owner strives to create a secondary meaning for its product, it is the consuming public which, in effect, determines whether that effort has succeeded." *Centaur Communications*, 830 F.2d at 1221 (citations omitted). The mere fact that Bristol places the name "PM" on its tablets does not persuade us that the consuming public associates that term with Bristol. Moreover, on the larger caplet version of the product, Bristol placed the entire "Excedrin PM" mark.

The district court was not clearly erroneous in classifying "PM" as a descriptive term in these circumstances. Because "PM" had not become primarily associated with a single producer in these circumstances, "PM" as used by Bristol is not by itself subject to protection under the Lanham Act. The district court therefore properly declined to enjoin McNeil from using the "PM" designator in connection with its combination analgesic/sleep aid.

### B. *Trade Dress Infringement*

■ McNeil appeals from the entry of a preliminary injunction preventing it from marketing "Tylenol PM" in the packaging that the district court found to have infringed on Bristol's trade dress. The "trade dress" of a product " 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.' " *LeSportsac, Inc. v. K mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985) (citation omitted). In examining trade dress the focus is on the *entire* look of the product or packaging. Individual aspects of a trade dress may be eligible for trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to the entire trade dress. The inquiry is whether the trade dress of a "junior user"—one who has adopted its mark or dress later than the "senior user"—is likely to cause consumer confusion as to the source of the product. As in the trademark arena, we must first determine whether a particular trade dress is eligible for protection under the Lanham Act.

The district court proceeded on the assumption, formerly the law in this Circuit, that, unlike trademarks, a trade dress was always ineligible for protection under section 43(a) in the absence of proof of secondary meaning. *See, e.g., LeSportsac*, 754 F.2d at 75. The Supreme Court, however, recently rejected this distinction between trademarks and trade dress. *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2760 ("We see no basis for requiring secondary meaning for inherently distinctive trade dress protection under § 43(a) but not for other distinctive words, symbols, or devices capable of identifying a producer's product.").

■ The district court made no finding as to whether the "Excedrin PM" trade dress was "inherently distinctive." However, if the district court was correct in determining that the trade dress had acquired secondary meaning, that dress is eligible for protection under section 43(a).

#### 1. Secondary Meaning

■ The secondary meaning inquiry is the same for trade dress as it is for a trademark. Bristol must show that the primary significance of its "Excedrin PM" trade dress is to identify the source of the product rather than the product itself. *See Inwood Laboratories*, 456 U.S. at 850–51 n.

11, 102 S.Ct. at 2187 n. 11. The question whether a mark or dress has acquired secondary meaning is a factual one that we will not reverse unless it is clearly erroneous. *See Murphy*, 923 F.2d at 928; *815 Tonawanda Street Corp.*, 842 F.2d at 647. The district court properly examined the *Thompson Medical* factors and concluded that Bristol's "Excedrin PM" trade dress had acquired secondary meaning. *See Thompson Medical*, 753 F.2d at 217.

 The district court found that Bristol's advertising expenditures in connection with "Excedrin PM" and its sales success weighed in favor of a finding of secondary meaning for the trade dress. It further held that consumer survey evidence introduced by Bristol, "though problematic in terms of some of its methodology," supported Bristol's claim of secondary meaning. The district court finally found that McNeil intentionally copied the "Excedrin PM" trade dress.

Given the deferential standard of review, we cannot say that the district court clearly erred in determining that the overall trade dress of "Excedrin PM" had acquired secondary meaning. This conclusion is strengthened by the well known trade name "Excedrin" prominently displayed on the "Excedrin PM" box as an integral part of the whole trade dress. That name strongly supports the district court's determination that consumers associate the trade dress, taken as a whole, with a particular producer.

### 2. Likelihood of Confusion

Having determined that the district court did not err in finding that the "Excedrin PM" trade dress is eligible for protection under section 43(a), we turn to the central question in this case: Whether McNeil's use of the "Tylenol PM" trade dress is likely to cause confusion as to the "origin, sponsorship, or approval" of "Tylenol PM" with "Excedrin PM." *See* 15 U.S.C. § 1125(a)(1).

Whether the public is likely to confuse two products is a question that is not easily answered. Our cases, however, have established an analytical framework designed to add structure to this nebulous inquiry and to guide judicial decisions toward some degree of predictability and uniformity.

In *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 7 L.Ed.2d 25 (1961), we examined similar marks used for dissimilar products. We set forth the following nonexclusive list of factors relevant to success on a Lanham Act claim:

> the strength of [the prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap [between the two products], actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495. We have subsequently held that these factors are appropriately considered when examining the likelihood of confusion between two competing products. *See, e.g., Thompson Medical*, 753 F.2d at 213–14.

 The standard of appellate review of a district court's conclusion regarding the likelihood of confusion between two products has split the courts of appeals. *See Euroquilt, Inc. v. Scandia Down Corp.*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986) (White, *J.*, dissenting from the denial of *certiorari* to resolve whether the determination of likelihood of confusion under section 43(a) is subject to *de novo* review as a conclusion of law or "clearly erroneous" review as a question of fact). In this Circuit, a district court's determination of the individual *Polaroid* factors are subject to review as findings of fact, subject to reversal only if clearly erroneous, while the ultimate balancing of all the *Polaroid* factors to determine the likelihood of confusion in any given case is done *de novo* by this Court. *See Murphy*, 923 F.2d at 928; *Western Publishing*, 910 F.2d at 61.

Some earlier cases in this Circuit have held that to the extent that the *Polaroid* factors rest on a comparison of the marks

themselves we are in as good a position to evaluate them as the district court and thus will evaluate those factors *de novo*. *See, e.g., McGregor–Doniger v. Drizzle,* 599 F.2d 1126, 1133 (2d Cir.1979). However, Rule 52(a) of the Federal Rules of Civil Procedure was amended in 1985 to require that "[f]indings of fact, whether based on oral or documentary evidence, . . . not be set aside unless clearly erroneous." Fed. R.Civ.P. 52(a). The Notes of the Advisory Committee on Rules accompanying that amendment emphasize that even where the appellate court is in as good a position as the trial court to make a given factual determination, the factfinding function should be left to the district courts because of "the public interest in . . . stability and judicial economy." Notes of Advisory Committee on Rules, 1985 Amendment. Thus, each of the *Polaroid* factors should be reviewed under Rule 52(a). *Cf. Johnson & Johnson v. GAC International,* 862 F.2d 975, 979 (2d Cir.1988) (finding of falsity in advertisement, formerly reviewed *de novo,* reviewed under amended Rule 52).

The only case that applies a *de novo* review to any *Polaroid* factor since the amendment to Rule 52(a) is *Centaur Communications,* 830 F.2d at 1226 ("Unlike the other factors, this finding [with regard to similarity of the marks] is reviewed *de novo* because an appellate court is in as good a position to evaluate this factor as is a trial court.") (citations omitted). In that case, the Court did not examine the amendment to Rule 52, and its statement that we review similarity of the marks *de novo* was not necessary to its holding. Therefore, we do not find that statement controlling.

Despite the existence and importance of the *Polaroid* factors, we must remember that they are merely tools "designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue," and that "the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid formula." *Lois Sportswear v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986) (citation omitted).

We now turn to an examination of the *Polaroid* factors. In the case of competing products, one of the *Polaroid* factors, proximity of the products in the marketplace, is necessarily answered in favor of the senior user, and another factor, the likelihood of bridging the gap, is not a relevant inquiry. Where, as here, the competitive products are of nearly identical quality, a comparison of the quality of the products is not particularly helpful in determining the likelihood of confusion. The remaining factors, however, require additional discussion.

### a. Strength of the "Excedrin PM" Trade Dress

The strength of a particular mark or dress is measured by its distinctiveness or the degree to which it indicates the source or origin of the product. *McGregor–Doniger,* 599 F.2d at 1131; *Banff, Ltd. v. Federated Dep't Stores,* 841 F.2d 486, 491 (2d Cir.1988). The strength of a mark should be examined in its commercial context. *Centaur Communications,* 830 F.2d at 1226.

We agree with the district court that the "Excedrin PM" trade dress, taken as a whole, strongly indicates the source of the product. The presence of the "Excedrin" trade name prominently displayed as an integral part of the trade dress demonstrates beyond question that the entire trade dress indicates the origin of the product.

### b. McNeil's Good Faith

Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products. *Charles of the Ritz Group v. Quality King Distrib.,* 832 F.2d 1317, 1322 (2d Cir.1987). "Although this factor alone is not dispositive, it bolsters a finding of consumer confusion." *Id.*

The district court here found that McNeil intentionally copied elements of Bristol's trade dress. There is evidence in the record to support that finding. McNeil concededly was aware of Bristol's trade dress. There was evidence that the target

market for "Tylenol PM" was the "Excedrin PM" user. Evidence also existed tending to show that the similarities in the trade dresses were raised by McNeil employees during the design process. There were many proposed trade dresses that did not incorporate substantial aspects of the "Excedrin PM" trade dress yet, as the district court noted, "every choice [McNeil] made brought it closer to the EXCEDRIN PM trade dress." An internal memorandum regarding the text to be placed on the package stated that it should appear "as in Excedrin PM." Based on this and other evidence in the record, the district court was not clearly erroneous in finding that McNeil had not exercised good faith in adopting its trade dress.

▋ Although there was sufficient evidence in the record to support the district court's finding with regard to McNeil's good faith, McNeil argues that the district court erred in rejecting, without receiving additional evidence, the findings of the magistrate judge, who had found that McNeil acted in good faith. District courts may designate a magistrate judge to conduct hearings and to submit to the district court proposed findings of fact and dispositions. 28 U.S.C. § 636(b)(1)(B). If a party files objections to those findings, as both parties did in this case, the district court is to

> make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The district court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence.

*Id.* at 636(b)(1). McNeil argues that before a district court may reject credibility findings of a magistrate judge it must recall witnesses and hear and observe them itself. We disagree.

McNeil's reliance on dicta from *United States v. Raddatz,* 447 U.S. 667, 681 n. 7, 100 S.Ct. 2406, 2415 n. 7, 65 L.Ed.2d 424 (1980), is unavailing. In that case, a criminal prosecution, the Court expressed skepticism as to whether a district court could reject dispositive findings of credibility without seeing and hearing the witnesses. Arguably, the rejection of the magistrate judge's conclusion by the district court was not based on witness credibility in this case. Moreover, we have indicated that the *Raddatz* dicta may be inapplicable outside the criminal context, *see Moore v. Ross,* 687 F.2d 604, 609 n. 5 (2d Cir.1982), *cert. denied,* 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 969 (1983), and where, as here, the civil party has raised no objection on those grounds before the trial court we will not reverse the district court's findings on that ground.

### c. Evidence of Actual Confusion

Before the magistrate judge, Bristol presented evidence of actual confusion that included two different types of consumer surveys, the results of McNeil's own television advertisement survey and questions from McNeil's employees regarding the similarity in the two trade dresses. The magistrate judge reviewed all of the evidence presented and found that Bristol had not demonstrated any actual confusion between the two products.

The district court addressed only the consumer surveys and found that they did not demonstrate any meaningful actual confusion between the products. The district court had before it evidence critical of the manner in which the surveys were conducted. Bristol has not demonstrated to us on appeal that the district court was clearly erroneous in placing little credence in those surveys. Nor has Bristol given us any reason to supplant the finding of the magistrate judge with regard to the other evidence of actual confusion. Therefore, Bristol has not demonstrated any meaningful instances of actual confusion resulting from the "Tylenol PM" trade dress.

### d. The Similarity of the Trade Dresses

The district court found that the two trade dresses were strongly similar. After examining the two trade dresses, we conclude that, although they share many similar elements, the prominence of the trade

names on the two packages weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging. Therefore, we find that the district court's finding on this issue was clearly erroneous.

Undeniably, the "Tylenol PM" trade dress shares many attributes with the "Excedrin PM" trade dress. The color scheme used by the two products is similar. Both products have the "PM" designator on the same line as the trade name. The text on the packaging is also similar. However, in a trade dress infringement case the question is not how many points of similarity exist between the two packages but rather whether the two trade dresses "create the same general overall impression." *RJR Foods v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979). The issue is whether the similarity between the two trade dresses will contribute to consumer confusion as to the origin of the product. *See Western Publishing*, 910 F.2d at 61 (" 'Ultimately, the crucial question is whether the similarity is likely to create confusion.' ") (citations omitted); *McGregor–Doniger*, 599 F.2d at 1133 (" 'Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question.' ") (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 82.1(a), at 601–02 (3d ed.1969)).

■ The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go far towards eliminating any possible confusion, *see, e.g., American Rolex Watch Corp. v. Ricoh Time Corp.*, 491 F.2d 877, 879 (2d Cir.1974) ("Rolex's reliance upon [section 43(a) ] appears to be misplaced in view of the prominent display of 'Ricoh' on the challenged watch."); *Bose Corp. v. Linear Design Labs*, 467 F.2d 304, 310 (2d Cir.1972) ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.") (footnote omitted), even though the appearance of the junior user's name does not in all cases eliminate the possibility of consumer confusion, *see Banff*, 841 F.2d at 492 ("Bloomingdale's attachment of its company name below its standard typestyle 'B Wear' mark does not offset the marks' similarity because the name is in very small letters and may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill.") (citation omitted).

In this case, by far the most prominent feature of the "Excedrin PM" trade dress is the trade name "Excedrin." At least as prominent on the "Tylenol PM" packaging is the trade name "Tylenol." These trade names are the major features of otherwise ordinary boxes. The "Tylenol" trade name is displayed in the same typeface used on other "Tylenol" products. In fact, except for the color of the box and the presence of "PM," the "Tylenol PM" trade dress is extremely similar to the trade dress of the other "Tylenol" analgesic products. The differences between the two trade dresses are therefore significant.

Despite the similarity between certain aspects of the two trade dresses, when taken as a whole, including the prominently displayed names, they are not similar in any manner that is likely to cause consumer confusion; in fact, the prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other *Polaroid* factors.

### e. Sophistication of the Purchasers

■ Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product. *See Centaur Communications*, 830 F.2d at 1228. The district court found that consumers of non-prescription analgesic/sleep aids were not typically careful or sophisticated in making their purchases. Given the expert testimony available to the district court that over-the-counter analgesics were "low involvement" purchases, and given the fact

that these products are relatively inexpensive, we cannot say that the district court was clearly erroneous in this regard. Thus, consumer sophistication in making a purchase of these products militates toward a likelihood of confusion.

### f. Ultimate Likelihood of Confusion

■ Having reviewed the district court's findings with regard to the *Polaroid* factors, we now engage in a *de novo* balancing of those factors in order to determine whether McNeil's use of the "Tylenol PM" trade dress is likely to cause confusion among consumers because of its similarity to the "Excedrin PM" trade dress. *See Murphy*, 923 F.2d at 928.

Although the overall trade dress of "Excedrin PM" strongly identifies the product with a particular source, it does so largely because the word "Excedrin" is emblazoned over almost half the package. The "Tylenol PM" trade dress differs significantly from the "Excedrin PM" trade dress in that it does not include the word "Excedrin." The absence of the name "Excedrin" from McNeil's product is a significant difference. Additionally, that absence is replaced by a different prominent name. The origin-indicating name "Tylenol" appears at least as prominently on the "Tylenol PM" trade dress as does "Excedrin" on the "Excedrin PM" trade dress. McNeil did not appropriate the aspect of the "Excedrin PM" trade dress that most strongly indicates the origin of the product and McNeil supplied the "Tylenol PM" trade dress with a marking that strongly indicated that the product emanated from a *different* source.

Even McNeil's bad faith in adopting many elements of the "Excedrin PM" trade dress does not alter that conclusion. Absence of good faith, like the other *Polaroid* factors, is not by itself dispositive in any given case. *See Centaur Communications*, 830 F.2d at 1228 (" '[I]f comparison of the [marks] reveals no fair ... issue concerning the likelihood of confusion, then

intent to copy, even if found from the proffered evidence, would not establish a Lanham Act violation.' ") (quoting *Warner Brothers v. American Broadcasting Co.*, 720 F.2d 231, 247 (2d Cir.1983)). The prominent placement of the "Tylenol" name goes far toward countering any suggestion that McNeil intended to confuse its customers as to the source of its product. We believe that even "low involvement" consumers will have a hard time missing the famous names that form the most prominent feature of the trade dress in each case. It is thus not surprising that Bristol was unable to present any meaningful evidence of actual confusion between the two products.

We do not mean to intimate that the distinctive elements of any trade dress may be freely appropriated as long as the junior user clearly identifies the source of the goods. In many cases, the distinctive elements of a trade dress may themselves be eligible for trademark protection. In other cases the trade name may be a less dominant feature of the entire trade dress and thus have less force in countering other similarities between two trade dresses. Also, the junior user's trade name may less strongly identify a particular source than the "Tylenol" name at issue here.

In this case, however, the trade name is the most prominent and distinctive feature in each of the two trade dresses. The fact that they each are nationally prominent names and are different on the respective packages outweighs the evidence that tends to demonstrate a likelihood of confusion.

Because there is no likelihood of confusion between these two products resulting from any similarities in their overall trade dress, we are left with a " 'definite and firm conviction,' " *see Standard & Poor's*, 683 F.2d at 708, that the district court erred in preliminarily enjoining McNeil from marketing "Tylenol PM" in the proposed trade dress. Thus we reverse the decision to grant preliminary relief on the Lanham Act claim.

## III. STATE UNFAIR COMPETITION CLAIMS

The district court also enjoined McNeil's use of its trade dress on the basis of New York and Florida common law of unfair competition. In order to prevail under New York law, a plaintiff must demonstrate a likelihood of confusion between the two products. *See Coach Leatherware,* 933 F.2d at 169. Similarly, likelihood of confusion is a necessary element of an unfair competition claim under Florida law. *See American Bank of Merritt Island v. First American Bank and Trust,* 455 So.2d 443, 445–46 (Fla. Dist. Ct.App.), *review denied,* 461 So.2d 114 (Fla.1984). As we have determined with regard to the Lanham Act claim, there is no likelihood of consumer confusion arising from McNeil's use of the "Tylenol PM" trade dress. Therefore, Bristol is not entitled to relief under its common law unfair competition theory.

■ Bristol also claims on appeal that it is entitled to a preliminary injunction, notwithstanding absence of confusion, under New York state common law under a theory of "misappropriation." Bristol seizes on our language in *Flexitized, Inc. v. National Flexitized Corporation,* 335 F.2d 774, 781–82 (2d Cir.1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965), to the effect that New York law will prevent a party from misappropriating " 'the results of the skill, expenditures and labors of a competitor.' " *Id.* at 781 (citations omitted). Bristol claims that the district court's finding of bad faith, without more, entitles it to relief under this theory.

We disagree. In *Flexitized,* we were faced with one party that had appropriated the name of another. Relief was unavailable under the Lanham Act because the name "Flexitized" was deemed descriptive and had not acquired secondary meaning. Because the appropriating party had exhibited bad faith and because the name had acquired some familiarity among the consuming public, we held that use of the name constituted unfair competition. We later clarified that this "misappropriation" theory still requires some confusion, if not

as to source at least as to sponsorship or permission. *See American Footwear Corp.,* 609 F.2d at 662. That type of confusion has not been demonstrated here.

■ More troubling is the application of New York law to Bristol's request to enjoin use of the "PM" mark. New York law, unlike federal law, does not conclusively presume that there is no likelihood of confusion if a descriptive mark has not acquired secondary meaning. *See Coach Leatherware,* 933 F.2d at 169. Although it may be very difficult to show a likelihood of confusion where the senior mark is not associated in the public mind with a particular producer, under New York law it is not impossible. The district court did not analyze the *Polaroid* factors with regard to the use of the "PM" designator and thus we can make no determination to that effect. We note only that, under New York law, an absence of secondary meaning in a descriptive mark does not necessarily result in defeat for the owner. The district court should consider this issue in the first instance.

## IV. THE NEW YORK ANTI–DILUTION STATUTE CLAIM

■ Bristol also appeals from the refusal of the district court to enter an injunction against McNeil on the basis of New York's "Anti–Dilution" statute, New York Gen.Bus.Law § 368–d. That statute states:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

New York Gen.Bus.Law § 368–d. As the plain language of the statute indicates, relief is available under section 368–d even when there is no likelihood of confusion as

to the source of the product. *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983); *Allied Maintenance v. Allied Mechanical Trades*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977).

The district court denied relief under section 368–d because Bristol and McNeil are direct competitors and the district court determined that section 368–d applied only to non-competing goods. Whether section 368–d applies to products in direct competition is a question that has split the district courts in this Circuit. *See E.P. Lehmann Co. v. Polk's Modelcraft Hobbies*, 770 F.Supp. 202, 206 (S.D.N.Y.1991) (collecting and discussing cases). New York courts have not directly addressed this issue.

We need not resolve this conflict over New York law because, even assuming *arguendo* that the statute applies to competitors, under the appropriate legal standard Bristol cannot prevail on its claim under section 368–d. "[O]nly those trade names which are truly of *distinctive* quality or which have acquired a secondary meaning in the mind of the public should be entitled to protection under the anti-dilution statute." *Allied Maintenance*, 42 N.Y.2d at 546, 399 N.Y.S.2d at 633, 369 N.E.2d at 1166. In interpreting this New York statute, we have held that it "protects only extremely strong marks." *Sally Gee, Inc.*, 699 F.2d at 625. The "PM" designator appended to the analgesic trade name does not qualify as an "extremely strong mark." Nor do the aspects of the "Excedrin PM" trade dress that are common to both products constitute "extremely strong marks." Thus, Bristol is not entitled to protection under section 368–d.

## V. DISMISSAL OF THE ACTION

█ Although this is an interlocutory appeal from a preliminary injunction, McNeil argues that we should dismiss Bristol's action in its entirety. The Supreme Court has cautioned that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (citations omitted). Although in the past we have dismissed Lanham Act cases on appeal from the grant or denial of a preliminary injunction, *see, e.g., American Cyanamid v. Connaught Laboratories*, 800 F.2d 306, 307 (2d Cir.1986), we do not believe that this case appropriately lends itself to such extraordinary summary disposition.

█ On this record, the balancing of the *Polaroid* factors does not convince us that Bristol is likely to succeed in its claim. However, findings of fact at the preliminary injunction stage are not binding at a trial on the merits. *See Camenisch*, 451 U.S. at 395, 101 S.Ct. at 1834. There remains the possibility, albeit slight, that Bristol will present evidence at trial—numerous instances of actual confusion between the two products by actual customers for example—that might lead to a change in the ultimate conclusion regarding the likelihood of consumer confusion. We therefore decline to dismiss Bristol's action in its entirety.

## CONCLUSION

For the reasons stated above, the district court erred in preliminarily enjoining McNeil from marketing its combination analgesic/sleep aid in the "Tylenol PM" trade dress. The injunction is therefore vacated and the matter is remanded to the district court.