**MERRIAM–WEBSTER,
INCORPORATED,
Plaintiff,**

v.

**RANDOM HOUSE, INC., Defendant.**

No. 91 Civ. 1221 (LMM).

United States District Court,
S.D. New York.

March 8, 1993.

Edward V. Filardi, Lile H. Deinard, White & Case, New York City, for plaintiff Merriam–Webster.

Roger G. Sugarman, Nancy S. Scherer, Joseph P. Salvo, Stephen H. Schwartz, Weil, Gotshal & Manges, Lawrence Rosenthal, Blum Kaplan, New York City, for defendant Random House.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

### I.

Pending before this Court are the post-trial motions of both plaintiff and defendant. Defendant Random House, Inc.'s ("RH") motion urges that the Court grant RH judgment as a matter of law pursuant to Fed. R.Civ.P. 50 or, alternatively, that the Court grant a new trial, in whole or in part, pursuant to Fed.R.Civ.P. 59. Plaintiff Merriam–Webster, Incorporated ("M–W") brings a cross motion for partial judgment as a matter of law and for attorneys' fees pursuant to Rule 50.

Plaintiff, a well-known publisher of reference books such as dictionaries, initiated the present action for federal trademark infringement, unfair competition and false designation of origin under the U.S. Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.*, and for unfair competition and trademark infringement under the law of New York against defendant RH, also a well-known publisher of, among other books, reference books, including dictionaries.

This action involves dictionaries published by the respective parties. In 1991, defendant commenced publication of its latest dictionary, whose title page reads "Random House Webster's College Dictionary." This dictionary will be referred to as the "RH Dictionary." Plaintiff's most recent dictionary was published in 1983 and its title page reads "Webster's Ninth New Collegiate Dictionary." This dictionary will be referred to

as the "M–W Dictionary." While the evidence and arguments on both sides have been wide-ranging, the dispute centers on two aspects of the RH Dictionary. M–W contends, first, that RH's use of the words "Webster's" and "College" in combination constitutes trademark infringement and, second, that the trade dress employed by RH violates M–W's rights.

A four-week jury trial began on September 19, 1991 and concluded when the jury answered the Interrogatories to Jury submitted to it at the conclusion of the trial and found in favor of plaintiff in the amounts of (i) $1,774,713 on plaintiff's Lanham Act § 43(a) claim for damages for trade dress infringement (which award was challenged as inconsistent by defendant and sustained by this Court in its Memorandum and Order dated December 23, 1991); and (ii) $500,000 on plaintiff's claim for punitive damages based on common law trade dress infringement.

Specifically, the jury made the following findings of fact in response to the Interrogatories to Jury submitted to it (the findings will be numbered as they were in the Interrogatories to Jury): (A1) that the phrase "Webster's Collegiate" is a trademark of M–W for dictionaries; (A2) that RH did not show that the phrase "Webster's Collegiate," as applied to dictionaries, is generic; (A3) that the phrase "Webster's Collegiate," as applied to dictionaries, is descriptive; (A4) that the phrase "Webster's Collegiate," as applied to M–W dictionaries, has acquired secondary meaning; (A5) that RH did not infringe M–W's trademark "Webster's Collegiate" for dictionaries; (A6) that M–W's trademark "Webster's Collegiate" for dictionaries is strong and distinctive; (A7) that RH diluted the distinctiveness of M–W's trademark "Webster's Collegiate" for dictionaries; (B1) that M–W's trade dress is distinctive; (B2) that M–W's trade dress acquired secondary meaning; (B3) that RH's trade dress infringed M–W's trade dress; (C1) that RH did not infringe M–W's registered trademark "Webster's Ninth New Collegiate Dictionary" in a circle; (D1) that M–W's trade dress is strong and distinctive; (D2) that RH's trade dress dilutes the distinctiveness of M–W's trade dress; (E1) that M–W's registered trademark "Webster's Ninth New Collegiate Dictionary" in a circle is strong and distinctive; (E2) that RH did not dilute the distinctiveness of M–W's registered trademark "Webster's Ninth New Collegiate Dictionary" in a circle; (F1) that RH's infringement was intentional; (F2) that M–W is to be awarded $1,774,713 (entered on the line reading "Merriam Webster's lost profits") plus zero (the line reading "Random House's net profits" was left blank) for a total of $1,774,713; (F3) that RH infringed M–W's common law trademark and/or trade dress rights maliciously or in wanton disregard of the rights of M–W so as to warrant an award of punitive damages; and (F4) that RH did not infringe M–W's federal trademark and/or trade dress rights maliciously or in wanton disregard of the rights of M–W so as to warrant an award of attorney's fees. In answer to the Counterclaim Interrogatories to Jury submitted to it, the jury answered as follows: (A1) that RH did not demonstrate that the word "Collegiate," as applied to dictionaries, is generic; (A2) that the word "Collegiate," as applied to dictionaries, is descriptive; (A3) that the word "Collegiate," as applied to M–W dictionaries, has acquired secondary meaning; and (B1) that RH demonstrated that the word "Webster's," as applied to dictionaries, is generic. In an additional Interrogatory to Jury, asking what amount of punitive damages, if any, it would award M–W on its claim for common law trademark and/or common law trade dress infringement, the jury stated "$500,-000."

The Court without jury rendered a judgment against defendant on defendant's fifth and sixth equitable affirmative defenses in the Court's November 8, 1991 decision on the record. In addition to the amounts awarded by the jury, the Court determined in its November 8, 1991 decision on the record that pursuant to 15 U.S.C. § 1117(a) the aforesaid award of $1,774,713 was to be doubled. In addition, the Court's January 3, 1992 Judgment granted certain permanent injunctive relief against defendant on the basis of the jury's answers to the Interrogatories to Jury. The January 3, 1992 Judgment therefore requires defendant to pay a total of $4,049,426 to plaintiff and to cease certain actions asso-

ciated with the behavior found by the jury to infringe federal and state law.

Defendant takes issue with virtually every aspect of the jury's verdict and award and the Judgment entered thereon. The Court will deal with each argument raised in defendant's motion and then with the two issues raised in plaintiff's motion in turn.

## II.

■ RH argues that M–W failed to prove that the RH Dictionary's total trade dress infringed the M–W Dictionary's total trade dress and that the jury's special verdict in this regard is not supported by properly admissible evidence. Specifically, RH contends that M–W sought to establish a likelihood of confusion with respect to *one* discrete element of the trade dress—the spine—rather than the *total* trade dress; that M–W failed to prove that the trade dress is likely to confuse an appreciable number of ordinary reasonable prudent purchasers—in effect that M–W failed to show that the relevant *Polaroid* factors weighed in its favor; and that M–W failed to prove that its trade dress acquired secondary meaning.

■ The Court concludes that all of these arguments regarding M–W's trade dress claim are without merit. From RH's voluminous brief, it appears that RH does not recognize the weight to which a jury verdict is entitled. *See Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740, 750 (2d Cir.1984) (a court "must accord substantial deference to the jury's determination of factual issues"). Seventh Amendment principles require that only very limited circumstances warrant a judgment notwithstanding the verdict or a new trial pursuant to Rule 50(b). The Second Circuit has stated that a judgment notwithstanding the verdict should be granted only in the following circumstances:

(1) There is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) There is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Newmont Mines, Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 132 (2d Cir.1986) (quoting *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688–89 (2d Cir.1983)). Similarly, for a party to prevail on its motion for a new trial, this Court must be convinced that "the jury has reached a 'seriously erroneous result' or the verdict is a 'miscarriage of justice.'" *Mallis*, 717 F.2d at 688–89 (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978)).

While this Court is free to consider the weight of the evidence and weigh the credibility of witnesses in determining whether to grant a new trial, even if this Court would have reached a different result than the jury had it been the finder of fact, it would still have to find the jury verdict to have been a "seriously erroneous result" in order to grant a new trial. Because substantial evidence was adduced at trial on which a jury could reasonably have found for M–W on its trade dress infringement claim, this Court will grant neither judgment n.o.v. nor a new trial.

The core issue in a trade dress infringement claim is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979). The Court of Appeals has articulated a now well-known list of relevant factors to aid in determining whether there is a likelihood of confusion in a Lanham Act case. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). They are: (1) the strength or weakness of plaintiff's trademark or trade dress; (2) the degree of similarity between the two products; (3) the proximity of the products in the marketplace; (4) actual confusion among customers; (5) the good faith intent of the defendant; and (6) the sophistication of the products' buyers. Moreover, in a trade dress claim, the plaintiff must prove "secondary meaning"—that "the consuming public immediately identifies the product with its maker." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991).

As a preliminary matter, RH argues that the jury was comparing only the trade dress

of the two dictionaries' *spines* rather than their total trade dress. RH is correct in asserting that trade dress refers to "the *total* image of a good as defined by its overall composition and design, including size, shape, color, texture, and graphics." *Id.* (emphasis added). While M–W would not be entitled to prevail on its trade dress claim if it had merely isolated a discrete part of the trade dress of the M–W Dictionary and proven secondary meaning and consumer confusion, such was not the case here.

The jury had before it extensive evidence of the dictionaries' common color; the similar (at least to a non-expert) typography of the word "Webster's" as used on the RH Dictionary's face and spine and the same word as used on the M–W Dictionary; prominence of the title ("Webster's College Dictionary", in contrast to "Random House," which was smaller and less eye-catching); and that "Webster's" was featured in bold white vertical type down the spine on a red background. The jury charge clearly set out the "total trade dress" standard as articulated in cases such as *Coach Leatherware:* "[t]rade dress of a product refers to the total image of the product and may include features such as size, shape, color or color combinations or graphics. In this case the focus of the inquiry is the respective dust jackets of the Merriam-Webster Dictionary and the new Random House Dictionary including the title, graphics, color and design." (Tr. 3461–62.) The jury examined the two dictionaries in question (as well as nearly all other competing dictionaries) throughout the four weeks of trial and answered the three relevant jury interrogatories in M–W's favor.[1]

■ The Second Circuit has noted that before the fact finder tackles the issue of likelihood of consumer confusion between two products, it must determine whether secondary meaning exists in that, due to the plaintiff's efforts in the marketplace and its use over time, consumers associate the plaintiff's trade dress with a particular source or origin. *See Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985). The jury expressly found that the M–W Dictionary had acquired secondary meaning. M–W presented evidence related to virtually all of the factors listed by the Court in *Thompson* (advertising expenditures; consumer studies linking the name to a source; sales success; unsolicited media coverage of the product; attempts to plagiarize the mark; and length and exclusivity of the mark's use) as non-determinative and non-exclusive factors relating to the "relevant factual calculus." *Id.* at 217. Moreover, the fact that only a consumer *study* as opposed to a consumer *survey* was introduced into evidence by M–W is not dispositive in light of substantial other evidence relating to advertising and promotion, sales success, and continuous and exclusive use since 1973. The evidence presented supports the jury's finding that the M–W Dictionary's total trade dress had acquired secondary meaning.

■ As emphasized *supra,* as long as the evidence presented could reasonably support a verdict in favor of M–W's trade dress claim, this Court will not disturb the jury's findings of fact.[2] Sufficient evidence was presented by M–W such that a number of the *Polaroid* factors clearly tip in M–W's favor, thereby satisfying the likelihood of confusion standard necessary to sustain a

1. RH notes that this Court had expressly considered and rejected the notion that the *total* RH trade dress was likely to be confused with the *total* M–W trade dress in its Memorandum and Order rejecting M–W's motion for a preliminary injunction. (Pr. Inj. Mem. and Order, dated March 27, 1991, at 12). The Court was not the finder of fact at trial; it would be improper for the Court to substitute its previous or present view of the facts. Moreover, contrary to RH's assertion, a considerable amount of additional evidence was before the jury at trial in contrast to the evidence the Court considered in its March 27, 1991 opinion.

2. In *Bevevino v. Saydjari,* the Court of Appeals upheld Judge Knapp's refusal to grant a new trial despite his apparent view that if he had been the fact finder, based on the evidence presented, he would have found for the appellant. The Court of Appeals noted that as long as the district judge believes the evidence supports the verdict and the verdict is not "seriously erroneous," the judge need not grant a new trial. *Bevevino,* 574 F.2d at 684–85. This Court does not disagree with the jury's verdict and does not adopt RH's one-sided view of the evidence adduced at trial.

trade dress infringement claim. M–W presented evidence that its total trade dress is strong and distinctive; that the dust jackets of the two dictionaries are very similar in a number of respects; that the two dictionaries compete directly; that there were some specific incidents of actual confusion; that RH did not adopt its new trade dress in good faith; and that, given the similarities between the dictionaries which confused some retailer buyers, relevant consumers are not sophisticated or careful enough to appreciate the differences between the dictionaries.

■ In any particular case, it is up to the jury to decide the relative weight, if any, to be assigned to each factor in determining likelihood of confusion, as well as to evaluate the evidence itself. In this Court's opinion, as to any or all of these factors, the jury could reasonably have concluded that they weighed in M–W's favor and that, therefore, a likelihood of confusion existed between the trade dress of the two dictionaries.[3] While RH presented conflicting evidence as to many of these factors (detailed unnecessarily in its Memorandum and Reply Memorandum on this motion), that fact does not require the Court to set aside the jury verdict.

### III.

■ RH next argues that M–W is not entitled to actual damages in any amount because it failed to establish *actual* confusion—as opposed to likelihood of confusion—relating to trade dress. In order to qualify for actual damages as opposed to equitable relief, the plaintiff must prove actual confusion. *See Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981). The essence of RH's contention is that none of the evidence adduced at trial was sufficient to establish actual confusion and that the jury instruction relating to actual confusion was misleading. The Court charged the jury as follows:

> In order for plaintiff to be entitled to its actual damages, it must establish the following requirements:
>
> \* \* \* \* \* \*
>
> Second, that there was at least one instance of actual confusion.

(Tr. 3483.)

The combination of evidence as to actual confusion presented by M–W satisfies the requisite legal standard. M–W's witnesses, including Phyllis Mosely and several sales representatives, were in some respects more convincing and more credible than the testimony of a consumer in a purchasing situation. Ms. Mosely was a dictionary user and potential purchaser; the sales representatives were involved in situations with people familiar with dictionaries who were nonetheless confused by the similar trade dress of the RH Dictionary.[4] Section 43(a) of the Lanham Act has not been interpreted so rigidly as to require that confusion *at the time of purchase* be shown. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986) (citing *Grotrian,*

---

**3.** Some of the extensive evidence before the jury tending to demonstrate likelihood of confusion on the part of consumers of dictionaries included: the appearance of M–W and RH Dictionaries, as well as other competing dictionaries; the manner in which dictionaries are marketed to the public; M–W's extensive product development and marketing of the M–W Dictionary and its predecessors; and the process by which the RH Dictionary was designed. RH argues that an independent designer, Peter Bradford, designed the dust jacket, and that this fact precludes a finding that RH intended to infringe M–W's trade dress. The fact that Bradford designed the dust jacket is irrelevant. Obviously, whatever Bradford may or may not have intended, RH adopted his design; there was evidence suggesting that RH gave Bradford substantial guidance, that RH was aware of the potentially confusing similarity to the M–W Dictionary, that RH made its dictio-

nary *more* similar in the final design process, and that it sought to use the similarity in marketing the dictionary. In sum, the combination of the RH Dictionary's typography (specifically of the word "Webster's"); the prominence, color, and relation of the word "Webster's" to the words "Random House" on the spine; and various memoranda between RH personnel and Bradford provide sufficient evidence for the jury's conclusion. It was up to the jury to infer from this evidence whether RH intentionally sought to deceive consumers.

**4.** The Court cautioned the jury that the hearsay evidence involved in the statements of third persons in conversations between M–W sales representatives and those persons was admissible only to show those speakers' state of mind, i.e. confusion. (*See, e.g.*, Tr. 549, 809.)

*Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975)). The jury could reasonably have inferred that these individuals would have been just as confused had they picked up the dictionary and brought it to a cash register for purchase. As M–W points out, it was reasonable for the jury to infer, and it was, in fact, extremely likely, that the RH Dictionary's appearance was what was causing confusion in various bookstores, in contrast to cases cited by RH where the cause of the confusion was not established. *Cf. Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 389 (S.D.N.Y.1985), *aff'd without op.*, 788 F.2d 3 (2d Cir.1986); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220, 1231 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

■ The fact that a survey of consumer confusion was not conducted is not dispositive and does not require disregard of the jury finding. While M–W's evidence of actual confusion was not voluminous, it was sufficient to undermine RH's contention that the lack of survey evidence created an inference that no actual confusion existed and that, therefore, the jury award of damages cannot be sustained.[5] The Second Circuit has not held that a consumer survey is mandatory to establish actual confusion (nor, apparently, has that Court specifically said that a survey is *not* necessary, in contrast to the Third Circuit which did so hold in *Charles Jacquin et Cie v. Destileria Serralles, Inc.*, 921 F.2d 467 (3rd Cir.1990)).[6]

The Second Circuit has noted that, in a particular case, the consumer survey may be unreliable and should not be used to demonstrate actual consumer confusion. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1045 (2d Cir.1992). In two other cases, the Court of Appeals has upheld the finding of actual confusion where *neither* witnesses nor consumer surveys were introduced, but in circumstances where the products could not be meaningfully inspected by the consumer. *Getty Petroleum Corp. v. Island Transport. Corp.*, 878 F.2d 650, 656 (2d Cir.1989); *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2d Cir.1987). In the present case, other evidence of actual confusion was introduced; therefore, this Court need only conclude that the lack of a consumer survey does not warrant a judgment n.o.v. or a new trial.

■ Because this Court does not believe that, due to errors in the jury charge concerning actual confusion, a "fundamental error" or "a miscarriage of justice" will occur if the Court does not reverse the jury verdict, the Court will not disturb the jury's implicit finding of actual confusion. *See, e.g., Frederic P. Wiedersum Assoc. v. National Homes Constr. Corp.*, 540 F.2d 62, 66 (2d Cir.1976) (quoting *Cohen v. Franchard Corp.*, 478 F.2d 115, 124 (2d Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973)). The jury charge clearly stated that at least one instance of actual confusion must be shown by M–W in order for M–W to recover actual damages.[7] (Tr. 3483.) There is no reason to

5. The Court emphasizes once again that while it might have been possible for a jury to infer (in part from the lack of survey evidence) that no actual confusion existed, this jury did not so infer; and this Court, given all of the evidence presented, will not mandate such an inference.

6. None of the district court cases cited by RH held that the lack of a consumer survey was anything more than *a* factor in the courts' determinations that likelihood of confusion was not adequately shown. *Revlon, Inc. v. Jerell, Inc.*, 713 F.Supp. 93, 98 (S.D.N.Y.1989); *Universal City Studios, Inc. v. T–Shirt Gallery, Ltd.*, 634 F.Supp. 1468, 1478 (S.D.N.Y.1986); *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 614 F.Supp. 1278, 1313, 1318 (S.D.N.Y.1985).

7. RH's statement that the only instruction given concerning actual confusion was given in the course of the Court's explanation of the *Polaroid* factors to be considered in determining likelihood of confusion is not correct. (RH Mem. at 55.) While the Court did not elaborate on the meaning of the term "actual confusion" in the damages charge, "actual confusion" was set out as one of the four elements that M–W was required to prove in order to recover its lost profits. There is no basis to infer that the jury confused the Court's charge on the *Polaroid* factors (including the relevance of the term "Webster's Collegiate Dictionary" and the jury's visual inspection of the book to that *jury* question of actual confusion) with the subsequent charge on damages where the Court stated that *M–W must* prove at least one instance of actual confusion. (*See* Tr. 3469–70 & 3483.)

believe the jury disregarded the requirement regarding M–W's burden in arriving at its decision to award damages to M–W. The Court and the parties discussed this charge at length. (Tr. 3284–85; 3339–41.) RH did not object to this aspect of the charge and it will not be heard to speculate as to what might have clarified the jury charge at this time.[8]

## IV.

■ In respect of the jury's damage award of $729,713, representing M–W's lost profits, RH contends that M–W is not entitled to that amount. RH argues that M–W failed to demonstrate with specificity that RH's trade dress infringement caused M–W's declining sales or that M–W's lost profits figure rose above pure speculation.

M–W presented evidence to the jury that its lost profits were caused by RH's infringement of its trade dress. The jury charge was clear that M–W had to show causation and amount of damages, which could not be speculative.[9] (Tr. 3483.) In support of its argument regarding the lack of causation evidence, RH raises six issues; however, as the extensive quotations in its brief from the trial transcript demonstrate, virtually all of these arguments were part of the evidence RH adduced at trial. The jury had the opportunity to weigh and consider RH's evidence in this regard as well as M–W's evidence. The Court does not believe there is a basis upon which it can conclude that the jury's finding was clearly erroneous or a miscarriage of justice, thereby warranting a new trial as in *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983), nor that the evidence was so lacking as to fulfill the standard in *Newmont Mines,* 784 F.2d at 132.

The lost profit evidence M–W presented to the jury was sound and the jury was entitled to rely upon it in arriving at its calculation of M–W's lost profits. The sales projections were prepared by M–W in the ordinary course of business; at the time of their preparation, M–W had no motive to artificially inflate the sales projections. The jury could reasonably infer that M–W's shortfall in sales was caused by RH's infringing dictionary. The profit per dictionary calculation was also reasonable. RH had adequate opportunity to refute M–W's evidence at trial.

## V.

■ Also in respect of the amount recovered, RH contends that the $1,045,000 representing RH's net profits was improperly awarded to M–W. The Court acknowledges that in light of the Second Circuit's decision in *George Basch Co., Inc. v. Blue Coral, Inc.,* which held that a plaintiff must prove that an infringer acted with "willful deception" before the infringer's profits may be recovered, the jury verdict awarding plaintiff $1,045,000 in RH's profits must be vacated. 968 F.2d 1532, 1540 (2d Cir.1992). The jury charge and interrogatories did not incorporate the "willful deception" standard that *Blue Coral* clearly enunciated. (*See* Tr. 3482, 3513 and Jury Interrogatory F1.) It simply is not clear that the jury in this case believed that RH's actions rose above the level of intentional behavior which *Blue Coral* explained could include conduct evidencing merely an intent to secure a " 'free ride' " as contrasted with "deliberate deceit" or "intentionally fraudulent conduct." *Id.* at 1541. As in the present case, the jury in *Blue Coral* found that Blue Coral " 'intended to imitate [plaintiff's] trade dress.' " *Id.* The Court of Appeals refused to consider this a "constructive finding" of "willful deception." *Id.* This

---

**8.** The Court is unpersuaded by RH's argument that it effectively objected to every aspect of the jury instructions that did not conform to its proposed instructions due to "insufficient time" to object. (RH Reply Mem. at 68.) Aside from the issue of whether it is appropriate for RH to raise this argument in a reply brief, the Court notes that this particular point in the charge was specifically agreed upon between the Court and counsel. RH was free to object to the final

charge and it did not do so. The Court had an extensive weekend discussion with counsel off the record (with the consent of counsel) as well as subsequently on the record (Tr. 3264–3361) regarding the jury charge.

**9.** RH did not object to this charge. (Tr. 3340–44.)

Court accordingly declines to so find here.[10] The jury verdict awarding M–W RH's profits is vacated and the Court finds that M–W is entitled to a new jury trial solely on the issue of whether RH's conduct constituted "willful deception" such that M–W should be awarded RH's profits.[11]

 Contrary to RH's assertions, the plaintiff's damage award under the Lanham Act may be cumulative: plaintiff may be awarded both defendant's profits and any damages sustained by the plaintiff. 15 U.S.C. § 1117(a). Where the plaintiff has proven that it suffered actual damages *and* that defendant has profited from its willfully deceptive infringement, the jury may properly award damages as to both. The *Blue Coral* decision clearly contemplated the possible appropriateness of awards of both kinds of profits (although that case did not involve an award of both). *Id.* at 1537 ("both damage and profit awards may be assessed 'according to the circumstances of the case' ").[12]

## VI.

 RH views the jury's written and verbal answers to Question F2, awarding $1,774,713 to M–W on the line labelled "Merriam Webster's lost profits" and leaving blank the line labelled "Random House net profits," as irreconcilably inconsistent. In view of this "inconsistency," this Court vacated the damage award and ordered a new trial "as to such portion of the damage award as is affected by the inconsistency." (Mem. and Order of November 20, 1991 at 4 (footnote omitted).) Upon M–W's motion for reconsideration pursuant to that ruling, however, the

Court reversed itself in its Memorandum and Order dated December 23, 1991, based largely on *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884 (2d Cir.1988). Defendant RH persists in its argument that the facts of this case differ from those in *Auwood*, and that other cases, more closely analogous to this case, support the granting of a new trial.

The Court declines to depart from its December 23, 1991 Memorandum and Order granting M–W's motion for reconsideration on the issue of the alleged inconsistency in the jury's response to Question F2. Despite the factual differences between the present case and *Auwood* (which this Court noted in its Memorandum and Order of December 23, 1991, at 4–5), the Court remains of the view that *Auwood*'s reasoning is clearly applicable. The Court will quote from its previous Memorandum which has not ceased to represent the Court's reading of *Auwood.*

> It seems more than clear enough that the jury intended to award plaintiff the full amount of damages claimed, comprising both plaintiff's lost profits *and* defendant's net profits. That the two components of the award were entered, as a total, on a line meant for one of them, is, in the Court's view, an "apparent inconsistency between the amounts and the labels," 850 F.2d at 893, and, as in *Auwood*, should be reconciled by allowing the entry of judgment in favor of plaintiff for the amount awarded by the jury, $1,774,713 (to be doubled pursuant to the Court's decision on the record on November 8, 1991). In the Court's view, upon reconsideration, the

---

10. The jury's finding that RH acted "maliciously or in wanton disregard" of M–W's rights so as to warrant an award of punitive damages (Interrogatory F3) is irrelevant, because the jury was considering the common law claims and whether to award punitive damages in particular. The fact that the jury gave different answers to Interrogatories F3 and F4 suggests that they were considering (not improperly) whether RH's behavior warranted an award of the specific damages set forth in each interrogatory. Because federal trade dress damages are distinct and because the Court did not instruct the jury with the proper legal standard, the responses to other interrogatories are of no moment.

11. All other liability findings will stand. No other issue will be considered if M–W elects to retry

whether it is entitled to RH's profits. In view of the foregoing, all of RH's other arguments as to the excessiveness of the *amount* of the jury's award of RH's profits need not be decided at this time. As in any jury award pursuant to Section 35(a) of the Lanham Act, this Court has the discretion to alter the recovery based on defendant's profit if it finds the jury's award to be either inadequate or excessive. *See Stuart v. Collins*, 489 F.Supp. 827, 833 (S.D.N.Y.1980).

12. The jury charge and the interrogatory were clear that the jury could award M–W's damages, RH's profits, both or neither, depending upon the jury's assessment of the evidence. RH objected to neither the jury charge on damages nor Interrogatory F2 during trial. (*See* Tr. 3481–81.)

Seventh Amendment requires such a result. Only in such a way can the jury's "evident effort to specify amounts of loss actually proven" [or at least claimed] be given effect. 850 F.2d at 893. (Mem. and Order of 12/23/91 at 6.)[13]

## VII.

 RH contends that this Court's decision to double the damages awarded by the jury to M–W was erroneous under the Lanham Act. Specifically, RH states that the law in this and other circuits is that Section 35(a) of the Lanham Act does not permit a damage award solely for punitive purposes. Moreover, RH argues, if the Court considers the full amount awarded by the jury as "damages," such a finding is inconsistent with the evidence and with the Court's prior acknowledgement that M–W sought only actual damages of $729,731; if part of the award represents defendant's profits, RH argues, the Lanham Act does not permit a doubling (or tripling) of such amounts not allocable to plaintiff's *actual damages.* Finally, RH argues that while the jury found RH's conduct to have been "intentional," it did not find it to be "willful," as required by the Lanham Act to support an enhancement of damages.

The Court's decision to double M–W's lost profits will stand notwithstanding that the award of RH's profits is vacated pending a jury determination of whether RH's conduct constituted willful deception.[14] The doubling of M–W's lost profits is fully justified under the Lanham Act. Section 1117(a) states that "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." The Court concluded that RH *willfully* infringed M–W's trade dress and therefore resolved to double the jury's damage award.

The Court's doubling of the jury's award of M–W's profits is justified under the analysis in *Getty Petroleum Corp. v. Bartco Petroleum Corp.* 858 F.2d 103 (2d Cir.1988), *cert.* *denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). That decision emphasized that damages may not be enhanced for a punitive purpose. "So long as [the enhanced award's] purpose is to compensate a plaintiff for *its actual injuries*—even though the award is designed to deter wrongful conduct—the Lanham Act remains remedial." *Id.* at 113. As this Court stated, its primary motivation for doubling the damages award was deterrence. (Tr. 3915.) The plaintiff who suffers at the hands of a competitor's intentional infringing behavior is damaged in intangible ways beyond the monetary calculation for lost profits. As the *Getty* Court noted, the "enhancement provision ... was included to enable courts to redress fully plaintiffs whose actual damages were difficult to prove." *Id.* at 110. The costs of pursuing the infringing competitor and of winning back lost reputation and good will is virtually always greater than the actual profits lost. The would-be infringer may be deterred by the knowledge that the Lanham Act attempts to make the injured party whole in the fullest sense. For the foregoing reasons, the Court adheres to its doubling of RH's profits.

## VIII.

 Defendant next argues that M–W was not entitled to punitive damages; the jury's verdict finding RH's conduct to be malicious and in wanton disregard of M–W's rights, warranting an award of punitive damages, was not supported by the evidence. RH states that under New York law, such an award will be sustained only where plaintiff establishes that it was entitled to a recovery of actual damages. RH argues elsewhere (see Sections III and IV of this opinion) that M–W failed to prove its entitlement to actual damages (as opposed to an award of RH's profits alone); therefore, no punitive damages award may be sustained here. Defen-

---

13. The Court's present decision to vacate solely that part of the jury's award representing RH's profits (*see* Part V) does not affect the Court's December 23, 1991 ruling, the reasoning of which clearly supports permitting the jury's award of M–W's lost profits ($729,713) to stand.

14. Depending upon the jury's finding, the Court will reconsider whether to enhance any jury award. *See supra* Note 11.

dant also emphasizes its earlier argument that because RH's conduct was not "willful" or "malicious," extraordinary monetary relief is not justified. Defendant RH further contends that the Court failed to instruct the jury on the standards governing punitive damages under New York law. In support of this contention, RH points out that the fact that the jury gave inconsistent answers to Questions F3 (punitive damages) and F4 (attorneys' fees) demonstrates that it was confused on the issue of punitive damages. RH maintains the inconsistency (which it sought to clarify while the jury was still empaneled) mandates a new trial.

The Court has already dealt with at least some of these arguments. As this Court has already discussed, M–W did prove its actual damages and causation sufficiently to sustain the jury's award of its lost profits under the Lanham Act. The jury's affirmative answer to Interrogatory F3 left no doubt that the jury believed that M–W proved that RH infringed its common law trade dress rights "maliciously or in wanton disregard of the rights of M–W so as to warrant an award of punitive damages." The evidence adduced at trial was sufficient to support this finding as well. In a separate interrogatory, the jury specified an amount ($500,000). This Court has no reason to disturb either of the jury findings. The jury charge and interrogatories were fully supported by the relevant law.[15] The fact that the jury answered Interrogatory F3 affirmatively and Interrogatory F4 negatively does not affect the validity of the responses. The questions asked about specific types of damages, i.e. whether RH's conduct *warranted* awards of punitive damages and attorneys fees, respectively. The jury was not acting inconsistently in opining that RH's conduct justified punitive damages under New York law, but that attorneys' fees should not be awarded under the Lanham Act. The agreed-upon form of the interrogatories clearly contemplated that the jury could answer one of the questions "yes" and the other "no."

### IX.

█ Regarding the jury's finding that RH diluted M–W's distinctive trade dress and M–W's "Webster's Collegiate" mark, RH argues that New York General Business Law § 368–d is inapplicable to this case, that M–W failed to prove the elements of trademark dilution (a strong and distinctive mark and a likelihood of injury to business reputation or likelihood of dilution of the distinctive quality of the mark), and that M–W failed to prove the elements of a trade dress dilution claim, as RH argued *supra*, (*see* Section II).

The Court of Appeals recently laid to rest any doubt as to the applicability of § 368–d in cases involving competing goods. The Court of Appeals resolved the conflicting cases in the Southern and Eastern Districts and ruled that § 368–d is applicable to competing goods, thereby agreeing in substance with this Court's holding in its Memorandum and Order of September 9, 1991. *See Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (1993).

█ The Court disagrees that the evidence submitted regarding the trade dilution claims was insufficient to sustain the jury's findings on the trade dilution issues. As to the jury's finding that RH's trade dress diluted the distinctiveness of M–W's trade dress, the evidence of trade dress infringement supports this verdict. *See* Section II *supra*.

█ As to the jury's finding that RH diluted the distinctiveness of M–W's trademark "Webster's Collegiate," the evidence adduced at trial was sufficient to support the elements of trademark dilution. For the same reasons outlined regarding RH's other attempts to undermine M–W's evidence and to present its own evidence anew, this Court will not disturb the jury's verdict. M–W has not "expressly abandon[ed] [its] mark, such as by cancelling it, or discontinue[d] using it with the intent not to resume use." *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88

---

**15.** RH did not object to either the jury charge or the form of the Interrogatories submitted to the jury.

L.Ed.2d 108 (1985). There was no significant evidence that the public ceased to associate "Webster's Collegiate Dictionary" with M–W. M–W adduced evidence which tended to show that RH's use of "Webster's College Dictionary" was tending to blur and whittle away the distinctiveness of M–W's mark. Given the substantial similarity of the two names, the diluting effect is not difficult to appreciate. *Mead Data Central, Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1029 (2d Cir.1989) (to maintain viable dilution claim, marks must be "very" or "substantially" similar).

## X.

■ RH submits that because M–W does not have a monopoly on either of the words "Webster's" or "College," and in light of the jury's findings, the scope of the permanent injunction is too broad, because it enjoins certain uses that are not likely to cause confusion.

■ The injunction in this case was purposely made very specific in order to avoid a direction that would ambiguously prohibit RH from adopting a name or trade dress that is "likely to confuse"—a standard that obviously would be extremely subjective and potentially overbroad. For this Court to rule that RH may use the word "Webster's" as the dominant or most prominent one on the spine as long as it does not cause consumer "confusion," invites continued controversy. With the exception of the word "Collegiate," RH is not prohibited from using other words in combination with "Webster's." *Cf. Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 511 (2d Cir.1969) (the injunction found to be overbroad covered "any name containing the words of one of the registered marks plus whatever additional words or terms may be added to them or inserted between them"). It is in the interest of both parties to this litigation to have specific parameters based closely on the infringements found by the jury in this case (as the Court believes its injunction is). The Court did not preclude RH's use of the generic term "Webster's" nor the word "College," but rather only certain infringing uses (similar to the infringing jacket) of the word "Webster's" or the combination of the two terms.[16] The Court will not use its equitable powers to alter or abolish the injunction as it now stands.

## XI.

■ The parties disagree as to the propriety of the Court's admission of an industry report containing information on RH's wealth. (The "B.P. Report," *see* Pl.App. Tab 61.) RH submits that it was improperly admitted hearsay and highly prejudicial, constituting reversible error. M–W contends that RH cannot now properly reargue this issue on the present motion, that the report was admissible hearsay, that RH "opened the door" to the introduction of such evidence, and that, in any event, any error was harmless because RH introduced company information which negated the impact of the report.

■ The Court ruling on this issue made at trial will stand. (Tr. 1344–45.) The Court agrees with M–W that a reasonable interpretation of Bruce Harris' testimony was that the reason for RH's distress at the unprofitability of its reference division was not that it was losing money, but that RH's most essential *raison d'etre*—to publish socially and educationally worthwhile books—was being curtailed. (*See* Tr. 1334–35.) This testimony could reasonably have left the jury with the impression that RH publishes at a loss and for primarily socially beneficial purposes. M–W was entitled to rebut this inference. RH, in turn, submitted evidence to the jury of its own internal financial data for the years 1986 through 1990, thereby mitigating any possible misimpression caused by the B.P. Report. (Tr. 3560.)

## XII.

■ RH alleges that the Court committed reversible error in refusing to admit evi-

---

**16.** As the Court stated on the record, it does not believe that the injunction runs afoul of First Amendment principles by restricting the creative impulses of RH. The injunction's limited effect on the dictionary's title and jacket design does not implicate artistic expression in a manner analogous to that in the relevant case law. *See, e.g., Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). (*See* Tr. 3916.)

dence to rebut M–W's survey evidence in that the Court screened relevant evidence, made credibility determinations and rendered findings of fact. As M–W points out, the Court dealt with this issue at two different points in this action. First, in connection with RH's pre-trial motion *in limine* to exclude the Epstein survey and later, during trial, as to whether plaintiff could introduce this evidence to the jury. The Court based its exclusion of the evidence on its relevance, not on its credibility. The Court believes the concerns it expressed on the record regarding relevance were valid and that the Court need not reverse its ruling. (Tr. 2867, 2966–69.)

### XIII.

Plaintiff M–W asserts that the Court should enter partial judgment for M–W on the ground that RH failed to meet its burden of proof that the single word "Webster's" is generic for dictionaries.[17] This Court is not convinced that the high standard necessary to grant judgment notwithstanding the verdict, which the Court employed in evaluating RH's motion, has been met by M–W's arguments. *See Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d at 132. The Court recognizes the persuasiveness of M–W's argument that the term "Webster's," as applied to dictionaries, is descriptive, rather than generic, because the term does not connote specific kinds or subcategories of dictionaries, but rather suggests a connection to Noah Webster, the renowned lexicographer. *See Park 'n Fly, Inc. v. Dollar Park and Fly,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) ("A 'merely descriptive' mark ... describes the qualities or characteristics of a good or service....").[18] However, there was

ample evidence suggesting that Webster's is a "common descriptive name" and therefore generic. *Id.* Certainly the sheer number, varied qualities, and the numerous publishers of and types of reference materials employing the term "Webster's" provides evidence in RH's favor. The essential fact remains that in *this* case the jury heard all of the evidence and concluded that "Webster's" was a generic term.[19]

### XIV.

M–W argues that it is entitled to an award of attorneys' fees under the Lanham Act. The Court disagrees. The Court is well aware that the jury's role in the matter of attorneys' fees is advisorial and that the issue is committed to the Court's discretion under Section 43(a) of the Lanham Act.[20] The Court determined to reach the same conclusion as the jury; the Court stated that "while I recognize that I may have the power to override the jury on the question of attorneys' fees, I am going to go with the jury...." (Tr. 3915.) The Court considers its interpretation of the jury's finding, that "the jury ... is free to say that they found Random House to have acted maliciously or in wanton disregard of Merriam–Webster's rights to a degree which did warrant an award of punitive damages but not to a degree in which they would additionally award attorneys' fees" (Tr. 3914–15), to have been sufficient justification for its exercise of discretion in following the fact-finder's advice.[21] There is no case requiring this Court to exercise its discretion to award attorneys' fees in favor of the prevailing plaintiff in a Lanham Act case.

\* \* \*

**17.** M–W does not object to the jury charge, but argues that the jury misapplied this instruction to the evidence.

**18.** As the Supreme Court explains, not all descriptive marks merit protection. Such a mark may only be registered if it has acquired secondary meaning. *Id.* M–W does not refute that, whether or not "Webster's" is descriptive, no individual publisher could prove secondary meaning as to the term.

**19.** The Court's ruling is not intended to apply to other cases, but is limited to upholding the jury's

interpretation of the evidence before it in this action.

**20.** The Court does not find any objection on the record by M–W to the submission of the advisorial question on attorneys' fees to the jury.

**21.** The Court does not find any inconsistency with its exercising its discretion to agree with the jury's advice on the issue of attorneys' fees and other rulings made by the Court, such as its decision to double damages, an issue also committed to the Court's discretion.

In sum, the Court denies defendant's motion except insofar as the Court vacates the jury's award of defendant's profits as the Court believes is required under *Blue Coral* and, if plaintiff so opts, will order a new trial solely on the issue of whether defendant's infringing conduct constituted "willful deception" and, if so, whether all, none, or any portion of defendant's profits should be awarded to plaintiff.

Plaintiff's motion is denied.

Plaintiff, M–W, may submit a revised judgment as against defendant, RH, in the amount of $1,459,426, as doubled damages on plaintiff's Lanham Act § 43(a) claim for trade dress infringement, and in the amount of $500,000 as punitive damages on its claim for common law trade dress infringement, for a total of $1,959,426, together with costs to be taxed by the Clerk.

The injunctive provisions of the Court's January 3, 1992 Judgment and that part of the Judgment in which the Court retains jurisdiction for enforcement thereof remain in full effect.

SO ORDERED.