**MERRIAM–WEBSTER, INC., Plaintiff–Appellee–Cross–Appellant,**

v.

**RANDOM HOUSE, INC., Defendant–Appellant–Cross–Appellee.**

Nos. 959, 960, 961 and 962, Dockets 93–7276, 93–7362, 93–7728 and 93–7776.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1993.

Decided Sept. 9, 1994.

Robert G. Sugarman, Weil, Gotshal & Manges, New York City (Nancy Scherer, Lori Pines, Weil, Gotshal & Manges, Ellis B. Levine, Diana R. Frost, Random House, Inc., Ralph P. Huber, Pamela A. Rask, Sabin Bermant & Gould, of counsel), for defendant-appellant-cross-appellee.

Lile H. Deinard, Schreiber, Simmons, MacKnight & Tweedy, New York City (Alan N. Sutin, Brian D. Graifman, Schreiber, Simmons, MacKnight & Tweedy, of counsel), for plaintiff-appellee-cross-appellant.

Before: MESKILL, WINTER, and PRATT, Circuit Judges.

WINTER, Circuit Judge:

Random House, Inc. appeals from Judge McKenna's order granting a permanent injunction under the Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1988), against infringement of Merriam–Webster, Inc.'s trade dress for the dust jackets of its dictionaries. We hold that, as a matter of law, no confusion or likelihood of confusion exists between the respective jackets. We also hold there is no dilution under New York law of either Merriam–Webster's trademarks or trade dress. We therefore vacate the injunction and order dismissal of the complaint. In light of that disposition, we need not address the various forms of other appellate relief sought by the parties through a petition for writ of mandamus and cross-appeal.

## BACKGROUND

Merriam–Webster publishes a variety of reference works that depict on the front cover of the dust jacket its "bull's eye" logo—a large white circle containing the word "Webster's" and a description of the type of work. Merriam–Webster has registered this logo as a trademark with the Patent and Trademark Office. The present action involves the ninth edition of Merriam–Webster's hardcover, abridged, desk-top dictionary that has been published in numerous editions since 1898. As described by Merriam–Webster's expert, the dictionary is one of a genre of works known as "college" dictionaries and is the market leader in this field. The eighth edition, published in 1973, bore the title *Webster's New Collegiate Dictionary*. The ninth edition was published in 1983 and bore the title *Webster's Ninth New Collegiate Dictionary*. The jacket design for the ninth edition is the one at issue in the instant matter.

The jacket has a bright red background. The front is dominated by the "bull's eye" logo—a large circle with a thin white outer rim, a thin blue inner rim, a central area with

a background of white and the title, "Webster's Ninth New Collegiate Dictionary" in blue. The diameter of the "bull's-eye" is slightly over 6". The jacket is roughly 10" by 6¾". The words "A Merriam–Webster" appear in white script above the "bull's-eye." The word "Webster's" appears in white vertically on the spine and occupies close to half the space. Horizontally in smaller type appear "Webster's Ninth New Collegiate Dictionary" at the top of the spine and "Merriam Webster" at the bottom. Both are in white.

Random House has published a "college" dictionary since 1947. In 1968, it titled its product "The Random House College Dictionary." The dictionary was marketed with a red dust jacket, the title in large black and white letters, and Random House's "house" logo—an angular drawing of a house—in white. The spine displayed the word "Dictionary" in large white letters.

The dispute underlying this action began in 1990, when Random House introduced a dictionary titled *Webster's College Dictionary.* The jacket is a slightly different shade of red than the plaintiff's dictionary jacket. Apart from the insertion of the word "Webster's," the new edition differs from the previous one only in that the words "Random House" and the "house" logo are slightly diminished in size, and the word "the" is deleted from the cover. Although smaller than in the prior edition, the logo and words "Random House" are in black and occupy roughly one-third of the front jacket. "Random House" is in block lettering and appears four more times on the outside jacket. The spine displays the word "Webster's" vertically in large white letters. Horizontally, in smaller black letters, is "Random House" at the top along with the "house" logo and "College Dictionary" at the bottom of the spine.

Several other publishers market a dictionary with the designation "Webster's" in the title. For example, Houghton Mifflin introduced its *Webster's II New Riverside University Dictionary* in 1984. Simon & Schuster introduced its *Webster's New World Dictionary, Third College Edition* in 1988. Both dictionaries are also marketed with a red dust jacket and with some of the title words lettered in white.

On February 20, 1991, Merriam–Webster brought the present action for infringement of its trademark, seeking damages, Random House's profits, and a permanent injunction under the Lanham Act § 43(a) and New York General Business Law §§ 368–d, 349 (McKinney 1988). Merriam–Webster moved for a preliminary injunction, which was denied, following an evidentiary hearing. The district court concluded that "there is not a likelihood of confusion warranting the issuance of a preliminary injunction." The key differences cited by the district court were the presence of Merriam–Webster's name and "bull's eye" motif on the cover of its dictionary and the words "Random House" and "house" logo on the front jacket of the Random House dictionary. Merriam–Webster then amended its complaint to include a claim for infringement of its trade dress under Lanham Act § 43(a).

Following a four-week trial, the jury answered nineteen questions on a special verdict form. The jury found that the phrase "Webster's Collegiate" as applied to dictionaries is a valid although unregistered trademark of Merriam–Webster. It found that the mark is not generic but is descriptive and had acquired secondary meaning. However, the jury found that Random House had not infringed Merriam–Webster's trademarks in either the words "Webster's Collegiate" or in the "bull's eye" logo. The jury did find, however, that Random House had diluted the distinctiveness of Merriam–Webster's trademark "Webster's Collegiate" in violation of New York law.

Addressing the trade-dress claims, the jury found that Merriam–Webster's trade dress is distinctive and had acquired secondary meaning. It further found that Random House had infringed that trade dress. Moreover, the jury found that Random House had diluted the distinctiveness of the trade dress but not the distinctiveness of the "bull's eye" logo. Finally, the jury found that Random House's trade dress infringement was intentional and awarded Merriam–Webster $1,774,713 for its lost profits, but nothing for Random House's net profits. The jury also found that the infringement was done "mali-

ciously or in wanton disregard of the rights of Merriam–Webster" warranting the award of $500,000 in punitive damages on the common law trade dress infringement claim, but not the award of attorneys' fees.

In response to the interrogatories on Random House's counterclaims, the jury found that the word "collegiate" as applied to dictionaries is not generic, but descriptive and had acquired secondary meaning. However, the jury found also that the word "Webster's" as applied to dictionaries is generic.

Following the verdict, the district court entered a judgment including damages under

the Lanham Act and common law claims [1] and an injunction. The injunction enjoined Random House from using its current jacket design or using the words "Webster's" or "College" on dictionaries that do not adhere to a stringent set of restrictions intended to differentiate the two companies' products.[2]

Random House moved for a judgment as a matter of law pursuant to Fed.R.Civ.P. 50 or alternatively for a new trial pursuant to Fed. R.Civ.P. 59. Merriam–Webster cross-moved for partial judgment as a matter of law under Rule 50 as to their request for attorneys' fees. The district court denied both motions,

---

**1.** The judgment granted Merriam–Webster double damages on the Lanham Act § 43(a) claim pursuant to Lanham Act § 35(a), 15 U.S.C. § 1117(a), in the amount of $3,549,426, which together with the $500,000 in punitive damages for common law trade dress infringement resulted in a total of $4,049,426. The district court vacated the compensatory damage portion of this award as irreconcilable with the jury's answers to the interrogatories on Random House's motion pursuant to Fed.R.Civ.P. 49(a). Although Merriam–Webster had requested only $729,731 in lost profits, it attempted to reconcile the jury's award of $1,774,731 in lost profits as actually representing a combination of its lost profits and Random House's profits or as an additional award for loss of goodwill. The district court then reversed its decision and reinstated the damage award on Merriam–Webster's motion for reconsideration on the basis of *Auwood v. Harry Brandt Booking Office*, 850 F.2d 884 (2d Cir. 1988). The court reconciled the jury's award as representing both Merriam–Webster's lost profits and Random House's profits. Because we order dismissal of Merriam–Webster's complaint, we need not address the district court's resolution of the Rule 49(a) issues.

**2.** The injunction reads in full:

[I]t is **ORDERED, ADJUDGED AND DE-CREED** that [Random House, Inc.], its officers, agents, servants, employees, attorneys, successors and assigns, and all persons or entities licensed by [Random House, Inc.] to manufacture dictionaries or any part thereof, and those persons acting in active concert or participation with them (but excluding customers not affiliated with defendant to whom defendant or any customer of defendant shipped dictionaries prior to the date hereof) who receive actual notice of this Judgment, by personal service or otherwise, are hereby permanently enjoined and restrained from:

1. Manufacturing, distributing, selling, offering for sale, marketing, promoting or advertising:

(i) any dictionary bearing the jacket an illustration of which is annexed as Exhibit A:

(ii) any dictionary including the word "Webster's" in its title, or otherwise displaying the word "Webster's" on its jacket, binding cover or title page, which bears a jacket that does not comply with the following conditions:

(a) the dominant or most prominent word on the spine may not be the word "Webster's";

(b) the word "Collegiate" may not be used;

(c) the typeface used for the word "Webster's" on any part of the jacket may not be the same as, or nearly resemble, that used for the word "Webster's" on the spine and within the circle on the jacket of plaintiff's *Webster's Ninth New Collegiate Dictionary;*

(iii) any dictionary including the word "Webster's" and the word "College" in its title, or otherwise displaying the word "Webster's" and the word "College" on its jacket, binding cover or title page, which bears a jacket that does not comply with the following additional conditions:

(d) the word "Webster's" must be immediately preceded or followed by the words "Random House";

(e) the word "Webster's," as used on any part of the jacket, must be in the same typeface as, and not larger in height than, the words "Random House";

(f) the words "Random House" must appear on the jacket in the same color as the word "Webster's."

2. Manufacturing or distributing any promotional materials, or placing any advertising, relating to any dictionary as described in ¶ 1, *supra*, that does not conform, in text or in depiction of dictionaries, or otherwise, to the conditions set forth in ¶ 1, *supra*.

3. Manufacturing, distributing, selling, offering for sale, marketing, promoting, or advertising any dictionary as described in ¶ 1, *supra*, the binding cover or title page of which does not conform to the conditions set forth in ¶ 1, *supra*, of this Judgment, provided, however, that this ¶ 3 of this Judgment shall not apply to title pages printed, or binding covers manufactured, prior to November 9, 1991.

but vacated the jury's award of Random House's profits and granted Random House a new trial on the issue of whether its conduct constituted "willful deception" under the standard announced in our intervening decision in *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). *Merriam–Webster, Inc. v. Random House, Inc.,* 815 F.Supp. 691, 700–01 (S.D.N.Y.1993).

## DISCUSSION

We have jurisdiction over the appeal from a permanent injunction under 28 U.S.C. § 1292(a)(1).

### 1. *Trade Dress Infringement*

■ "A product's trade dress is its total image" composed of "features such as size, shape, color or color combinations, texture, [or] graphics." *Paddington Corp. v. Attiki Importers & Distribs.,* 996 F.2d 577, 582 (2d Cir.1993) (internal quotations and citation omitted). Lanham Act § 43(a)(1) protects trade dress by creating a cause of action against

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

15 U.S.C. § 1125(a) (1988).

In order to demonstrate infringement of its trade dress, Merriam–Webster had to show, first, that its trade dress had acquired secondary meaning or is inherently distinctive, and, second, that a likelihood of confusion exists between that trade dress and that of Random House's dictionary. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615

(1992). We have no difficulty in concluding that the jury's findings that Merriam–Webster's trade dress was distinctive and had acquired secondary meaning were supported by the record.

The more difficult question, however, concerns the existence of likelihood of confusion between the two dictionaries. We have traditionally determined likelihood of confusion by applying the factors set out by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). As we recently noted, the list of *Polaroid* factors is not exclusive and the analysis of the factors is "not a mechanical process." *Paddington,* 996 F.2d at 584. The *Polaroid* factors are "merely tools designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1044 (2d Cir.1992) (internal quotations and citation omitted). The issue is not similarity in the abstract, but "whether the similarity between the two trade dresses will contribute to consumer confusion as to the origin of the product." *Id.* at 1046. Whether likelihood of confusion exists is a matter of mixed fact and law reviewed *de novo. Paddington,* 996 F.2d at 584–85; *Murphy v. Provident Mut. Life Ins. Co.,* 923 F.2d 923, 928 (2d Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991).

The relevant *Polaroid* factors in the instant matter are: (i) the strength of Merriam–Webster's trade dress, (ii) the proximity of the products in the marketplace, (iii) Random House's bad faith in adopting its trade dress, (iv) the similarity between the two trade dresses, (v) evidence of actual confusion, and (vi) the sophistication of relevant consumer groups. Although the jury was instructed on the *Polaroid* factors and charged that it could not find Random House liable without finding a likelihood of confusion, the interrogatories did not elicit answers explicitly conforming to those factors. The special verdict makes explicit only that the jury found Merriam–Webster's trade dress to be strong and distinctive, factor (i). It may also be inferred that the jury found

the obvious fact that the two dictionaries are in close proximity in the market, factor (ii); and, based on the finding of malicious conduct, that Random House acted in bad faith, factor (iii). We have no problem with the jury's conclusions regarding (i) and (ii). The finding of (iii), bad faith, is discussed *infra*.

We turn to a comparison of the jackets to determine factor (iv), the degree of similarity. Both dictionaries' jackets bear red backgrounds and some white lettering, but that is also the case with regard to the Houghton Mifflin and Simon & Schuster "college" dictionaries as well as the earlier (non-"Webster") Random House edition that Merriam–Webster found unobjectionable. Moreover, in the center of the "bull's-eye," the Merriam–Webster dictionary prominently bears the title "Webster's Ninth New Collegiate Dictionary" in bright blue, a color not used on the Random House jacket. The colors used by Random House, therefore, are not likely to contribute significantly to consumer confusion between the trade dresses in question.

The conspicuous use of very different logos and of the names of the publishers significantly distinguishes the two trade dresses. With regard to the logos, Merriam–Webster's cover jacket is dominated by its "bull's eye," while the Random House jacket has the utterly dissimilar "house" logo. Whereas the circular "bull's-eye" occupies one-third to one-half of the Merriam–Webster front jacket, and, as the rear jacket depicts, similarly dominates the cover on several other Merriam–Webster reference works, no remotely similar configuration appears on the Random House jacket. To the contrary, Random House's logo features sharp angles and a drawing of a dwelling.

As noted, both dictionaries prominently indicate the publisher's name on the front of the jacket. Although the "house" logo is far smaller than the "bull's-eye", it and the name "Random House", in black and in block letters, occupy almost one-third of the Random House front jacket. The name "Random House" is used four other times on the jacket. The name "Merriam–Webster" is in white script on the cover of its dictionary.

In *Bristol–Myers Squibb Co.*, 973 F.2d at 1037, competing analgesics devoted approximately one-third of the face of their packaging to their respective brand designators. Despite similarities in coloration, we held there that "although they share many similar elements, the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging." *Id.* at 1045–46. Similar considerations apply in the instant matter.

What similarity there is between the two jackets, apart from the use of red as background, is in the two spines, which feature the name "Webster." As noted, however, the color red (in different shades) is standard for dictionaries, and the word "Webster's" is generic. Both spines, moreover, feature the quite different names of the publishers.

The fatal flaw in Merriam–Webster's case is the unstated (for obvious reasons) premise that the "bull's-eye" logo and the very name Merriam–Webster are neither strong nor distinctive. The jury, of course, found to the contrary, and there is ample evidence of Merriam–Webster's consistent promotion of the "bull's-eye" logo and its name on a variety of reference works. Unless the circular "bull's-eye", which dominates the front cover and is displayed on six other works depicted on the back, and the name "Merriam–Webster," which is used once on the front and on the spine and numerous times on the back, are regarded as such insignificant features that confusion with an angular drawing of a house and the name "Random House" can exist, the jackets are not confusingly similar.

In so concluding, we are not dissecting the trade dress by comparing the similarity of individual elements, *Universal City Studios v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984); *J.R. Wood & Sons v. Reese Jewelry Corp.*, 278 F.2d 157, 159 (2d Cir.1960); *Girl Scouts of the United States v. Bantam Doubleday Dell Publishing Group*, 808 F.Supp. 1112, 1124 (S.D.N.Y.1992) ("Plaintiffs' mark may not be dissected to prove similarity to or public confusion with Defendants' books."), *aff'd*, 996 F.2d 1477 (2d Cir.1993). Rather, we are assessing "the general impression conveyed to the public" by the entirety of the

dress. *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581–82 (2d Cir.1991); *see Bristol–Myers Squibb Co.*, 973 F.2d at 1046 ("[T]he question is not how many points of similarity exist between the two packages," but general impression). We find that the impressions conveyed by the combinations of angular and curving logos, and by quite different names and some different colors (bright blue is used for the title on the Merriam–Webster work), preclude a finding of similarity.

Indeed, a finding of similarity of trade dress would rest solely on a dissection of individual elements, in particular the use of "Webster's" and "College." Even then, however, the pertinent finding cannot be made. The word "Webster's" is itself generic as applied to dictionaries, as the jury found and under long-standing Supreme Court precedent. *G. & C. Merriam Co. v. Syndicate Publishing Co.*, 237 U.S. 618, 622, 35 S.Ct. 708, 709, 59 L.Ed. 1148 (1915). Moreover, Merriam–Webster's expert testified, and other evidence also demonstrates, that "college" describes the genre of hardcover, desk-top, abridged dictionaries. Although the style and placement of a generic word may be protected as an element of trade dress, the presence of a generic word alone cannot support an inference of likelihood of confusion in the presence of prominent source identifiers and wholly dissimilar logos.

■ Merriam–Webster's evidence of actual confusion, factor (v), consisted only of the testimony of several of its own salesmen, the testimony of one person who was giving the dictionary away, the testimony of another who read a review in a magazine, and photographs of Merriam–Webster and Random House dictionaries shelved side-by-side at bookstores. There was no testimony by any consumer, retail or wholesale, who intended to buy a Merriam–Webster dictionary but mistakenly bought a Random House dictionary because of confusion between the two products' trade dresses. The lack of survey evidence counts against finding actual confusion. *Essence Communications v. Singh Indus.*, 703 F.Supp. 261, 269 (S.D.N.Y.1988) (citing cases). We conclude that Merriam–Webster failed to show actual confusion affecting purchasers.

■ Finally, factor (vi), the sophistication of the relevant consumer group, weighs heavily against Merriam–Webster. In assessing this factor, one must look to "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979) (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 81.2, at 577 (3d ed. 1969)). Analysis of sophistication as a *Polaroid* factor involves those persons who are likely to purchase the product. In the instant matter, there are two pertinent classes of potential consumers: retail book sellers and individuals. Generally, the retailers may be assumed to be sophisticated buyers. *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993). Moreover, ordering the dictionaries requires the retail book seller to contact the particular publisher, and it is virtually inconceivable that a book seller would call Random House believing it was Merriam–Webster. Again, Merriam–Webster's claim is implicitly based on an unstated assumption of its virtual anonymity as a dictionary publisher.

With regard to individual purchasers, the dictionaries in question are sold at retail for approximately twenty dollars and designed for at least several years of use, in both respects unlike the "low-involvement" goods at issue in *Bristol–Myers Squibb Co.*, 973 F.2d at 1046–47. Individual purchasers of dictionaries are generally literate, moreover.

■ The single *Polaroid* factor supporting a finding of likelihood of confusion is the inference that Random House acted in bad faith, factor (iii), that may be drawn from the jury's conclusion that the publisher acted with malice. There is no question that Random House believed that jacket design affected sales and was fully aware of the Merriam–Webster jacket. There is also evidence that Random House recognized a similarity in the spines. However, the rest of the evidence demonstrates only that Random

House was aware that red was in general use as a background color for such dictionaries and that "Webster" and "college" were deliberately emphasized on the jacket. The jury found "Webster" to be a generic term, and Merriam–Webster's own proof was that "college" was a descriptive term that referred to this genre of dictionaries. We do not pause to consider whether the record supports the jury's finding because what little evidence of bad faith exists is insufficient by itself to show a likelihood of confusion.

Based on a weighing of the *Polaroid* factors, therefore, there is as a matter of law no likelihood of confusion between Merriam–Webster's trade dress and Random House's.

## 2. *Dilution*

Merriam–Webster argues that the jury's findings of dilution of its trade dress and of the unregistered mark "Webster's Collegiate" under N.Y.Gen.Bus.Law § 368–d entitle it to an injunction. For many of the reasons underlying our holding of no likelihood of confusion on Merriam–Webster's trade dress claims, the jury's findings with regard to dilution are not supported by the record.

New York's anti-dilution statute provides that:

dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark ..., notwithstanding the absence of ... confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368–d (McKinney 1988).

■ This proscription applies to competitors, as in this case, as well as non-competitors. *Nikon, Inc. v. Ikon Corp.,* 987 F.2d 91, 96 (2d Cir.1993). Section 368–d was enacted to prevent "the gradual whittling away of a firm's distinctive trade-mark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977). This section applies with equal force to the protection of trade dress. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10–11 (2d Cir.1987).

■ In order to prevail on a claim of dilution under Section 368–d, the plaintiff must prove, first, that its trade dress or trademark either is of truly distinctive quality or has acquired secondary meaning, and, second, that there is a "likelihood of dilution." *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983). In the context of this case, dilution concerns whether "[j]unior uses may blur a mark's product identification...." *Id.* (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* § 84.2, at 954–55). Under the language of the statute, Merriam–Webster need not show likelihood of confusion to prevail on its Section 368–d dilution claims. However, it must show that Random House's product "weakened, blurred or diluted the degree of value or quality" of Merriam–Webster's trade dress or trademark. *Miss Universe, Inc. v. Patricelli,* 753 F.2d 235, 238 (2d Cir.1985). Several factors are relevant to the determination of likelihood of dilution in this case: (i) relative renown of the marks and dresses, (ii) similarity of the marks and trade dresses, and (iii) sophistication of consumers. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A.,* 875 F.2d 1026, 1035 (2d Cir.1989) (Sweet, J., concurring).

■ With regard to trade dress, the dilution claim is that the two jackets were sufficiently similar that consumers would less readily identify Merriam–Webster's distinctive trade dress with Merriam–Webster's product. The elements of similarity, sophistication, and predatory intent remain for Section 368–d dilution purposes the same as for Section 43(a) purposes and lead to the same result. The only factor that weighs in favor of Merriam–Webster's dilution claim is the jury's finding that Random House "maliciously or in wanton disregard of the rights of Merriam–Webster" infringed Merriam–Webster's trade dress rights. However, this single factor, which, as noted above, is not strongly supported in the record, is insufficient to support a finding of likelihood of dilution in light of the prominent display of very dissimilar source identifiers, including the publishers' names and quite different logos.

The jury also found that Merriam–Webster had an unregistered trademark in "Web-

ster's Collegiate" as applied to dictionaries and that Random House's work diluted that mark. The district court upheld the jury's verdict on the perceived "substantial similarity" of that phrase and Random House's use of "Webster's College Dictionary.". We disagree.

 First, the phrase "Webster's Collegiate" does not appear anywhere on the jacket of Merriam–Webster's dictionary. Rather, the jacket displays "Webster's Ninth New Collegiate Dictionary." Although Merriam–Webster's brief repeatedly refers to the ninth edition as "Webster's Collegiate Dictionary," that precise title appears not to have been used for decades, and it is, therefore, of highly questionable strength. *Cf.* Lanham Act § 45, 15 U.S.C. § 1127 (1988) ("Nonuse [of mark] for two consecutive years shall be prima facie evidence of abandonment."); *Silverman v. CBS, Inc.*, 870 F.2d 40, 47 (2d Cir.) (mark unprotected when discontinued for over 20 years and no plans existed for use in reasonably foreseeable future), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (two years of non-use of mark gives rise to rebuttable presumption of abandonment).

Second, the phrase is merely the combination of a generic word, "Webster's," and a descriptive word, "Collegiate." *See J.R. Wood & Sons, Inc.*, 278 F.2d at 159 ("Trademarks containing a word in the public domain are said to be less confusingly similar if they resemble each other only by the inclusion of a word which is in the public domain.") (internal quotation and citation omitted). Although a descriptive word may assume trademark status through the accumulation of secondary meaning in the minds of the consuming public, *Western Publishing Co. v. Rose Art Indus.*, 910 F.2d 57, 60 (2d Cir.1990), any claim to a right to prevent the use of similar but different words is weakened by the established concurrent use of similar descriptive words by competitors. *See Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993); *W.E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 871 (2d Cir.1966) ("[T]he law does

not favor trademark monopolization of such descriptive terms."). Several other dictionary publishers, including Random House, have used the adjective "College" or "University" to describe their dictionaries. Several also have attached the generic term "Webster's" to their dictionaries. Merriam–Webster's own evidence was that "college" is used to. describe the pertinent genre of dictionaries. No publisher (including Merriam–Webster) uses the precise phrase "Webster's Collegiate." Whatever Merriam–Webster's rights in that phrase, the general and prolonged use of "Webster's" and "college" by other publishers negates as a matter of law any claim that Random House's combined use of those words diluted those rights, if any.

## CONCLUSION

For the foregoing reasons, we reverse, vacate the district court's injunction, and direct the dismissal of Merriam–Webster's complaint. In light of our disposition of the underlying action, we need not address the various forms of other relief sought by the parties.