**COMPUTER ASSOCIATES INTERNATIONAL, INC., Plaintiff,**

v.

**AJV COMPUTERIZED DATA MANAGEMENT, INC., Defendant.**

**No. CV 93–5496.**

United States District Court, E.D. New York.

June 26, 1995.

Weil, Gotshal & Manges by Kevin P. Hughes, and Stephen Kahn, New York City, for plaintiff.

Carella, Byrns, Bain, Gilfillan, Cecchi, Stewart and Olstein by John N. Bain, and Dennis F. Gleason, Roseland, NJ, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

### I. FINDINGS OF FACT

In the above-captioned dispute between computer software manufacturers, plaintiff Computer Associates International, Inc. ("CAI") seeks a declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that its use of the name "CA–Simply Tax" or "Simply Tax" does not infringe United States Trademark Registration No. 1,500,316 (the "TAX$IMPLE trademark") as a defense to counterclaims brought by defendant AJV Computerized Data Management, Inc. ("AJV") for trademark infringement, pursuant to Section 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), as well as unfair competition and trademark dilution, pursuant to N.Y.Gen. Bus.L. § 368–b and § 368–d, respectively. The Court, having denied AJV's motion for a preliminary injunction, by order dated February 14, 1994, held a trial in this matter on October 4 and 5, 1994.

CAI is one of the largest independent software manufacturers in the world. In 1988, CAI introduced a software package called "CA–Simply Accounting." In June 1993, it introduced "Kiplinger's Simply Money." CAI launched "Kiplinger's Simply Money" by free giveaway—that is, it gave the product to anyone who made a telephone request during an initial period at no charge other than postage and handling. Approximately 1.5 million copies were distributed under the giveaway plan. CAI maintained a list of approximately 700,000 of those people who received the free software.

In October 1993, CAI entered into an asset-purchase agreement with a Netherlands corporation, Softkey Products International, B.V., by which CAI acquired the rights to software called "Easy Tax."

CAI's in-house counsel ran a trade-name search for the name "Simply Tax." The search did not reveal similar marks. CAI then filed an application with the United States Patent and Trademark Office (the "PTO") based on intent-to-use for "CA–Simply Tax." The PTO's response indicated: "The Examining Attorney has searched the Office records and has found no similar registered or pending marks which would bar registration...." Plaintiff Exh. ("PX") 8. Not during negotiation for "Easy Tax" nor at any point before November 1993, when AJV contacted CAI, did anyone at CAI know of the existence of the TAX$IMPLE trademark.

In late October 1993, CAI launched its sales and marketing campaign for "CA–Simply Tax." As it had done before, CAI undertook a giveaway program. CAI placed advertisements in a multitude of publications, including: *Home Office Computing* (December 1993); *Inc.* (December 1993); *Money* (January 1994); *PC Magazine* (December 7, 1993, January 11, 1994); and *PC World* (January 1994). In addition, fliers were sent directly to the 700,000 consumers who had participated in the "Kiplinger's Simply Money" giveaway. The marketing effort informed consumers that the software could be obtained for the cost of postage and handling by placing a telephone order. The launch attracted unsolicited attention from the print media, as evidenced by an article in *The New York Times*, dated October 28, 1993, which reported: "Computer Associates, which created a marketing stir in June with its offer of free personal finance software is back for an encore. This time it's free tax software." Approximately 400,000 consumers obtained "CA–Simply Tax" through the initial giveaway.

"CA–Simply Tax" is designed for use by individuals preparing their own tax returns. It is not capable of preparing corporate, part-

nership, or S corporation tax returns. CAI's marketing for the product was and continues to be directed at the consumer—the individual who uses computer software to help in preparing his or her own tax returns. Although a statement on the back of the "CA–Simply Tax" packaging indicates that the product would also be of use to professional tax preparers, the pitch on the packaging, when taken as a whole, is directed to the consumer. For example, the introductory language, found in large, italic type on the top left corner of the package's back, explains: "CA–Simply Tax asks questions and you answer, just like the professional tax preparers do."

At the time of trial, consumers could purchase "CA–Simply Tax" by mail or in retail stores for approximately $35. CAI also sells software called "CA–Simply Finance," which is a combination package of "Kiplinger's Simply Money" and "CA–Simply Tax."

CAI presented survey evidence, through the expert testimony of Philip Johnson, the president of a Chicago-based marketing firm, asserting that the simultaneous existence of the "CA–Simply Tax" name and the TAX$SIMPLE trademark had not caused a significant level of consumer confusion. Mr. Johnson surveyed 400 personal computer owners from the Atlanta, Baltimore, Chicago, Dallas, and Los Angeles areas. Consumers were approached in shopping malls and asked questions testing their capacity to recollect associations between various software products and their advertisements. AJV presented expert testimony challenging the relevance and credibility of Mr. Johnson's survey. The Court, however, finds CAI's survey evidence both relevant and credible.

AJV did not present consumer survey evidence in support of its counter-claims.

AJV obtained a federal registration for the TAX$IMPLE trademark and adopted it in December 1983 for use with its software. "TAX$IMPLE" is geared for the professional tax preparer. AJV's advertising for the product appears, with one exception, in accounting and other professional trade journals. The preprinted order form for "TAX$IMPLE," which opens with the address "Dear Tax Preparer," requires the purchaser to certify that he or she "is a profes-

sional tax return preparer, and accountant, a tax matter person or corporate tax department," PX 33. The cost of the "['TAX$IMPLE'] main programs" are $499. Trial Transcript ("TT") at 127 (testimony of AJV's principal John Vora). Other versions sell for $275.

AJV manufactures a version of "TAX$IMPLE" for consumers, which costs $49. This version is neither packaged, sold in retail stores, nor the subject of AJV's advertisements. AJV did not document the sale of even one consumer version at trial. Mr. Vora testified that AJV had been trying to break into the retail market since 1991 without success. He testified that those efforts continue, but AJV's own industry expert admitted that he had not become aware of AJV's desire to extend beyond the professional market until he heard testimony in that regard earlier in the trial. *See* TT at 195–96 (testimony of Jules Gildner, a computer magazine editor).

Mr. Vora testified that AJV had a limited marketing budget for "TAX$IMPLE"; that it could not afford to advertise more heavily than it already had; and that its failure to reach the consumer market was attributable to insufficient capital.

AJV presented evidence as to actual confusion. Mr. Vora testified that he received a letter, dated December 18, 1993, from a "['TAX$IMPLE'] dealer" in Colorado, which indicated the writer's concern "that the names 'Tax Simple' and 'Simply Tax' creates too much confusion and would lead practitioners to believe perhaps they overpaid for the wrong product." Defendant Exh. AJ. Perry Kothari, a friend of Mr. Vora, testified that he had asked Mr. Vora at a social function in November 1993 whether AJV was giving away free software packages. Eric Adams Snyder, an AJV employee whose responsibilities include communicating with the United States Internal Revenue Services ("IRS"), testified that IRS personnel were confused by the two names. AJV's showing did not, however, include evidence as to any potential purchaser, professional or nonprofessional, who was actually confused.

AJV presented no evidence indicating that "TAX$IMPLE" received unsolicited media coverage.

Although CAI acknowledged that "CA–Simply Tax" was initially laden with a few minor programming glitches, there was no evidence at trial indicating that consumers experienced trouble with "CA–Simply Tax," or that the software was in any way inferior by industry standards.

In November 1993, CAI received a letter from AJV communicating AJV's belief that CAI was infringing the TAX$IMPLE trademark and engaging in unfair competition by its distribution of "CA–Simply Tax." Attempts by both parties to negotiate a settlement were unsuccessful. CAI then filed the complaint in this action seeking a declaration that it is acting within the law. AJV's answer included various counter-claims.

In May 1993, a decision was made at CAI to remove the "CA" prefix from the "CA–Simply Tax" name. No evidence was presented at trial by either party regarding this decision. On November 9, 1994, a month after the trial concluded, CAI began using the name "Simply Tax" for its product. By order dated February 7, 1995, the Court granted AJV's motion for an order reopening the record and directing the parties to submit evidence as to the name change. CAI submitted an affidavit, exhibits, and an amended proposed findings of fact; AJV submitted nothing. The Court finds that neither CAI nor its counsel acted in bad faith in failing to disclose the pending name change during trial.

## II. CONCLUSIONS OF LAW

### A. Lanham Act Claims

■ In order to prevail on its counter-claims for trademark infringement, pursuant to 15 U.S.C. § 1114, or false designation of origin, pursuant to 15 U.S.C. § 1125(a),[1] AJV must show a likelihood of confusion. *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 570–71 (2d Cir.1993). In assessing whether a likelihood of confusion exists, courts typically apply the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir.1992). The factors are: (1) strength of the senior user's mark; (2) degree of similarity between the marks; (3) competitive proximity of the products; (4) likelihood that the senior user will "bridge the gap"; (5) evidence of actual confusion; (6) good faith adoption of the junior mark; (7) quality of the junior user's product; and (8) sophistication of the relevant consumers. *Polaroid*, 287 F.2d at 495.

### 1. Strength of AJV's Mark

■ This factor measures the " 'distinctiveness of [the senior user's] mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular although possibly anonymous source.' " *W.W.W. Pharmaceutical*, 984 F.2d at 572 (quoting *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). A mark's strength is assessed using two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace. *Id.*

■ Courts measure the inherent distinctiveness by reference to the four catego-

---

1. The owner of a trademark registered by the United States Patent and Trademark office has a cause of action against

  [a]ny person who shall, without consent of the registrant, ... use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or cause mistake, or to deceive.

  15 U.S.C. § 1114(1)(a). In addition, any person is prohibited from using

on or in connection with any goods or services, or any container for goods ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to its origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a).

ries set forth by the in *Abercrombie & Fitch v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). *W.W.W. Pharmaceutical*, 984 F.2d at 572. "Arrayed in an ascending order which roughly reflects ... the degree of protection accorded, [the] classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch*, 537 F.2d at 9. Whereas a descriptive mark describes the product's features or qualities in ordinary language, *McGregor–Doniger*, 599 F.2d at 1131, *see* 3 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 18.04 (1983), a suggestive mark merely suggests the features of the product, "requiring the purchaser to use 'imagination, thought and perception to reach a conclusion as to the nature of the goods.' " *W.W.W. Pharmaceutical*, 984 F.2d at 572 (quoting *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985)). The combination of "tax" and "simple" falls short of describing a computer tax preparation program, but it does suggest a product designed to streamline the tax preparation process, quite possibly through the use of a computer. The Court concludes that the TAX$IMPLE trademark is suggestive.

■ Suggestive marks, however, are not always strong marks; along with inherent distinctiveness courts should also consider the degree to which the mark has achieved secondary meaning. *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 (2d Cir.1991). Secondary meaning—the extent to which consumers have come to identify a mark with a particular product—can be determined by assessing several factors, including: advertising expenditures; consumer studies linking the mark to its source; sales success; unsolicited media coverage of the product; attempts to plagiarize the mark; and length and exclusivity of the use of the mark. *See Thompson Medical*, 753 F.2d at 217 (citations omitted); *see also Bristol–Myers*, 973 F.2d at 1043 (identifying the *Thompson Medical* factors as proper criteria for measuring the extent to which a given term has acquired secondary meaning).

■ AJV has used the TAX$IMPLE trademark since 1983 in the tax professionals software market. It has advertised in that market to a certain degree. As a result, the TAX$IMPLE trademark must have acquired some measure of secondary meaning among professional tax preparers. Mr. Vora's testimony regarding AJV troubled finances, however, indicates that sales of "TAX$IMPLE" are not terribly strong. There was no evidence of significant advertising expenditures on AJV's part, nor was there evidence of unsolicited media coverage for "TAX$IMPLE." No consumer survey supported the proposition that tax preparers have come to associate the mark with its source. Neither CAI, nor anyone else, attempted to plagiarize the TAX$IMPLE trademark. The Court concludes that the degree of secondary meaning achieved by the TAX$IMPLE trademark in the software market for professional tax preparers is at best minimal. The Court also concludes that the TAX$IMPLE trademark has no secondary meaning in the consumer market.

Notwithstanding its suggestiveness, lack of secondary meaning detracts from the strength of AJV's mark. The Court concludes that AJV's mark has moderate strength, entitling it to less than the full extent of trademark protection in the professional tax preparer market, and still less in the consumer market.

### 2. *Degree of Similarity Between the Marks* [2]

■ This factor examines whether a similarity between the marks or names is likely to cause consumer confusion. *Lang*, 949 F.2d at 581. Courts look at the "general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember." *W.W.W. Pharmaceutical*, 984 F.2d at 573 (citing *McGregor–Doniger*, 599 F.2d at 1133). The marks in the instant case combine "tax" with either "simple" or "simply." In that respect, they create a similar general impression. The fact that "tax" precedes "simple" in AJV's mark and follows "simply" in CAI's does not without more create a distinction

**2.** The Court considers CAI's mark to be "Simply     Tax" not "CA–Simply Tax."

that consumers are likely to perceive and remember. Consumers may distinguish between the products to a certain extent because CAI's mark comprises two separate words, only the initial letters of which are capitalized, whereas AJV's mark is a compound word comprised of all capital letters, and because AJV's mark makes use of "$" instead of "S," but the general impression remains similar.

Notwithstanding the similarity in the marks, dissimilar modes of presentation of the marks to the public makes confusion less likely. AJV's mark reaches the public only through print advertisement; CAI's mark is disseminated by print advertisement and sleek, four-color packaging. AJV's packaging is nondescript.

### 3. Competitive Proximity of the Products

■ This factor focuses on whether the products compete with each other. "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." Lang, 949 F.2d at 582. The products involved in the instant case fall within the same general class in that they are software designed to assist in the preparation of tax returns; that, however, is where the proximity ends. AJV's product is geared almost exclusively to professional tax preparers; whereas, CAI's is geared almost exclusively to consumers preparing their own returns. AJV sells wholesale; CAI sells retail. The purchase prices are considerably different, and, with one exception, the products are advertised in different publications with different readerships. The Court concludes that the products do not compete with each other.

### 4. Likelihood AJV Will "Bridge the Gap"

This factor "protect[s] the senior user's 'interest in being able to enter a related field at some future time.'" W.W.W. Pharmaceutical, 984 F.2d at 574 (quoting Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1172 (2d Cir.1976). Although AJV insists that it intends to enter the retail market, it has been trying to do just that for several years without success. Its own software industry expert was not even aware of AJV's attempts to bridge the gap until he came to court. The Court concludes that there is little likelihood that AJV will "bridge the gap."

### 5. Evidence of Actual Confusion

■ At its heart, the Lanham Act "seeks to prevent consumer confusion that enables a seller to pass 'off his goods as the goods of another.'" W.W.W. Pharmaceutical, 984 F.2d at 574 (quoting Programmed Tax Sys., Inc. v. Raytheon Co., 439 F.Supp. 1128, 1132 (S.D.N.Y.1977) (citations omitted)). Thus, evidence of confusion, "which affects 'the purchasing and selling of the goods or services in question,'" is highly probative. See Lang, 949 F.2d at 583 (quoting Programmed Tax Sys., 439 F.Supp. at 1132).

■ AJV alleges that CAI caused consumer confusion at various levels of the market. It alleges that retail consumers will accidentally purchase "CA–Simply Tax" instead of "TAX$IMPLE"; that tax preparers will mistakenly advise customers to purchase "CA–Simply Tax" instead of "TAX$IMPLE"; and that tax preparers who hear complaints from customers about "Simply Tax" will think that they are complaints about "TAX$IMPLE." The last allegation falls under the rubric of reverse confusion. AJV, however, did not advance testimony of a single consumer, retail or wholesale, who intended to buy AJV's software but mistakenly bought CAI's because of confusion between the two marks. As such, AJV failed to show any actual confusion. See Merriam–Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d. Cir.1994).

### 6. Good Faith Adoption by CAI

■ This factor "'looks to whether [the junior user] adopted its mark with the intention of capitalizing on [the senior user's] reputation and good will and any confusion between his and the senior user's product.'" Lang, 949 F.2d at 583 (quoting Edison Bros. Stores, Inc. v. Cosmair, Inc., 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). Good faith can be found where the junior user has selected a

mark that reflects the user's image or the product's characteristics, or has requested a trademark search. *See W.W.W. Pharmaceutical*, 984 F.2d at 575 (citing *E.S. Originals Inc. v. Stride Rite Corp.*, 656 F.Supp. 484, 490 (S.D.N.Y.1987)).

AJV failed to prove that CAI acted with anything less than good faith in selecting the name "Simply Tax." Given the names of CAI's other software products, CAI would have been foolish to give its tax software any other name. Its choice of the name "CA–Simply Tax" and then the name "Simply Tax" was wholeheartedly logical and was made in good faith. Moreover, CAI requested a trademark search.

### 7. *Quality of CAI's Product*

■■■ Where the junior user's product is of inferior quality, the senior user "is entitled to protect 'the good reputation associated with its mark from the possibility of being tarnished by inferior merchandise of the junior user.'" *W.W.W. Pharmaceutical*, 984 F.2d at 575 (quoting *Scarves by Vera, Inc.*, 544 F.2d at 1172). There was no evidence that CAI's product suffered from anything more than the normal glitches that often accompany a new product into the market. Based on the evidence, it is inconceivable that the reputation of AJV's product was adversely affected by the introduction of "CA–Simply Tax" into the market.

### 8. *Sophistication of Buyers*

■■■ In order to determine whether confusion is likely, a court must consider " '[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods....'" *McGregor–Doniger*, 599 F.2d at 1137 (quoting 3 Callman, *supra*, § 81.2). Generally, the more sophisticated the consumer, the less likely he is to be confused.

In the instant case, the relevant class of buyers are tax preparers offering services on a retail level. Buyers who purchase by telephone or mail are not prone to the type of confusion that will result in placing an order with the wrong seller. *See Merriam–Web-*

*ster*, 35 F.3d at 72. CAI's software is marketed to consumers and sells for approximately $35; AJV's is marketed to tax preparers and sells for as much as $499. No tax preparer, whether he be an individual doing part-time work for friends and relatives, or a partnership, or a corporation, is apt to accidently purchase CAI's software instead of AJV's because of confusion as to the marks.

### 9. *Conclusion as to the Polaroid Factors*

■■■ The TAX$IMPLE trademark is moderately strong and there is a significant degree of similarity between it and the alleged infringing mark. The remaining *Polaroid* factors, however, weigh heavily against a finding of likelihood of confusion. The products are sold in different markets, and there is little likelihood that AJV will "bridge the gap" in the future. There is no evidence indicating that any potential purchaser was actually confused. CAI adopted its mark in good faith; its product is not of inferior quality; and the relevant purchasers are ones who are not likely to be confused. The Court concludes that there is no likelihood of confusion.

As such, CAI is entitled to a declaration that neither its use of the name "CA–Simply Tax" nor its use of the name "Simply Tax" infringes the TAX$IMPLE trademark, and AJV's Lanham Act counter-claims must be dismissed.

### B. *Unfair Competition Claim*

■■■ In order to prevail on an unfair competition claim in New York, the senior user must demonstrate a likelihood that consumers confused its product with that of the junior user. *Coach Leatherware Co. v. Ann-Taylor, Inc.*, 933 F.2d 162, 169 (2d Cir.1991). The *Polaroid* factors may be used to measure likelihood of confusion for the purpose of a New York unfair competition claim. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1048 (2d Cir.1992). For the reasons above, no likelihood of confusion exists. As such, AJV's unfair competition counter-claim must be dismissed.

### C. *Dilution Claim*

Section 368–d of the New York General Business Law was enacted to prevent "the gradual whittling away of a firm's distinctive trade-mark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (N.Y.1977). In order to prevail on a claim of dilution under § 368–d, the AJV must prove: (1) that its trademark either is of distinctive quality or has acquired secondary meaning; and (2) that there is a "likelihood of dilution." *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 73 (2d Cir.1994). Factors relevant to dilution are: (a) relative renown of the marks; (b) similarity of the marks; (c) similarity of the products covered by the marks; (d) sophistication of the consumers; (e) predatory intent. *Mead Data Cent., Inc. v. Toyota Motor Sales*, 875 F.2d 1026, 1035 (2d Cir.1989) (Sweet, J., concurring). Predatory intent involves more than mere knowledge of the senior user's mark—it requires a showing that the junior user adopted its mark hoping to benefit commercially from association w/ the senior user. *Id.* at 1037.

As discussed above, AJV's mark has some measure of distinctiveness, but has acquired little or no secondary meaning. AJV's mark is less renown than CAI's, the relevant consumers are sophisticated, and CAI did not act with predatory intent. The Court concludes that, even though the marks are similar, there is no likelihood of dilution. AJV's dilution counter-claim must be dismissed.

### III. *CONCLUSION*

For the above reasons, CAI is entitled to the relief sought in Count I of the complaint, and AJV's counter-claims should be dismissed. The Clerk of the Court is directed to enter declaratory judgment in favor of CAI on Count I,[3] and dismiss AJV's counter-claims.

SO ORDERED.

---

**3.** At the close of its case at trial, CAI voluntarily dismissed the remaining counts in the complaint.